FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

NOV 0 6 2023

KEVIN P. WEIMER, Clerk
By:                Deputy Clerk

Jamaree James, Pro Se
6470 St. Mark Way
Fairburn, GA 30213
678-775-9078
Jamaree.rjames@gmail.com

United States District Court for the Northern District of Georgia

~~IN THE SUPERIOR COURT OF THE STATE OF GEORGIA~~
~~COUNTY OF FULTON~~
Atlanta Division

| | |
|---|---|
| JAMAREE JAMES PRO SE,<br><br>    Plaintiff,<br><br>vs.<br><br>EVERETT FINANCIAL, INC.; JPMORGAN SECURITIES, LLC, GOVERNMENT NATIONAL MORTGAGE ASSOCIATION, MR. COOPER GROUP INC., FIRST ALLIED BANK DBA SERVBANK, US BANK, NA AS TRUSTEE FOR SECURITIZED TRUST GNMA 2019-097 TRUST, MORTGAGE ELECTRONIC REGISTRATION SYSTEM, ("MERS"), AND DOES 1 THROUGH 100 INCLUSIVE, *et al.*<br><br>    Defendants | Case No.:  1: 23 -CV- 5 1 15<br><br>PLAINTIFF'S COMPLAINT FOR: LACK OF STANDING TO FORECLOSE, BREACH OF CONTRACT, QUIET TITLE, TEMPORARY RESTRAINING ORDER/INJUNCTIVE RELIEF |

**PLAINTIFF'S COMPLAINT FOR: LACK OF STANDING TO FORECLOSE, BREACH OF CONTRACT, QUIET TITLE, TEMPORARY RESTRAINING ORDER/INJUNCTIVE RELIEF**

COMES NOW the Plaintiff, Jamaree James, Pro se ("Plaintiff"), complaining of the Defendants as named above, and each of them, as follows:

**JURISDICTION**

1. Venue is proper in Fulton County, as the actions complained of occurred in Fulton County. This Court has jurisdiction over this matter pursuant to the State Constitution and statute.

## THE PARTIES

2. Plaintiff is now, and at all times relevant to this action, a resident of the County of Fulton, State of Georgia.

3. At all times relevant to this action, Plaintiff owned and has superior claim to the Real Property (the "Home") located at 6470 St. Mark Way Fairburn, GA 30213.

4. Defendant Everett Financial, Inc. is a corporation, a Non-Depository Payor Bank doing business in the County of Fulton, State of Georgia. Plaintiff is informed and believe and thereon alleges that Everett Financial, Inc. is the Original Lender.

5. Defendant US Bank, NA is a National Association doing business in the County of Fulton, State of Georgia. Plaintiff is informed and believes and thereon alleges that US Bank, NA is the Trustee of the GNMA 2019-097 Trust.

6. Defendant Servicer is an as-of-yet unidentified corporation doing business in the County of Fulton, State of Georgia. Plaintiff is informed and believes and thereon alleges that Defendant is the Servicer of Plaintiff's loan.

7. Defendant JPMorgan Securities, LLC is a limited liability company doing business in the County of Fulton, State of Georgia. Plaintiff is informed and believes and thereon alleges that JPMorgan Securities, LLC is the Sponsor of the GNMA 2019-097 Trust.

8. Defendant Government National Mortgage Association is a government sponsored enterprise doing business in the County of Fulton, State of Georgia. Plaintiff is informed and believes and thereon alleges that Government National Mortgage Association is the Depositor.

9. Defendant, Mortgage Electronic Registration Services, Inc., aka MERS ("MERS"), MERS is doing business in the County of Fulton, State of Georgia. Plaintiff is informed and believes and thereon alleges that MERS was acting in the capacity of electronic agent as a purported Nominee/Beneficiary for Everett Financial, Inc. under the Deed; subsequently acting in a capacity of bailor/bailee for each successor defendant of bankruptcy remote Special Purpose Vehicle GNMA 2019-097 Trust.

10. Plaintiff does not know the true names, capacities, or basis for liability of Defendants sued herein as Does 1 through 100, inclusive, as each fictitiously named Defendant is in some manner liable to Plaintiff, or claims some right, title, or interest in the Property. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained through discovery. Plaintiff is informed and believes and thereon alleges that at all relevant times mentioned in this Complaint, each of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiff so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

11. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-ventures of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

## GENERAL ALLEGATIONS

12. This is an action brought by Plaintiff for declaratory judgment, injunctive and equitable relief, and for compensatory, special, general and punitive damages.

13. Plaintiff, homeowner, disputes Defendants' superior colorable claim to legal title and equitable title of the Prime Market Real Property in question (hereafter, the "Real Property"), which is the subject of this instant action. Plaintiff is the owner of the property by Note and Deed of Trust (Exhibit A, Exhibit B).

14. From 1998 until present, over 70 million purported consumer credit mortgage loan transactions were purportedly sold by Non-Depository Payor Banks to Special Purpose Vehicles (hereinafter "SPV"). The Plaintiff's purported home loan was one of the 60 million scheduled to for exchange.

15. Plaintiff is informed and believes, and thereon alleges that Defendants participated in a transactional scheme whereby a purported Tangible Note is converted/exchanged for a Payment Intangible asset to provide an alternative investment offering via Special Deposit to certificate or bond holders which were expected to be relatively safe; which, were offered by Wall Street Firms to the secondary market through purported mortgage backed securities. (Exhibit C) OCC Asset Securitization Manual 1997, Pg. 23



16. Plaintiff is informed and believes, and thereon alleges that, certain tax laws known as the Real Estate Mortgage Investment Conduit (hereafter, REMIC) Tax Reform Act of 1986 were to be observed, and whereby the Non-Depository Payor Banks and Issuing Entities REMIC would be protected from either entity going into bankruptcy. To achieve the desired "bankruptcy remoteness," purported numerous "True Sales" of Plaintiff's Tangible Note would have had to of occurred by operation of All applicable law.

17. Plaintiff is informed and believes, and thereon alleges that there was no "True Sale" of Plaintiff's Tangible Note, a circumstance whereby Everett Financial, Inc. sold Plaintiff's Tangible Note to the "buyer/seller" JPMorgan Securities, LLC in an ordinary course of business by offer, acceptance, delivery and consideration given for full value of the entire instrument. (Exhibit D) Real Estate and the Tax Reform Act of 1986.

18. The Original Lender, Everett Financial, Inc., purports to have negotiated in accordance to all applicable law the Tangible Note obligation in an ordinary course of business to successor Defendants. Plaintiff is informed and believes, and thereon alleges that Everett Financial, Inc. has unlawfully purported to assign, transfer, or convey its interest in Plaintiff's Note on or before closing date of GNMA 2019-097 Trust. Plaintiff is informed and believes, and thereon alleges that Everett Financial, Inc. never negotiated the Tangible

Note by operation of law for full value in accordance with all applicable law to JPMorgan Securities, LLC.

19. Defendants deployed MERS as an electronic agent under the Constructive Deed of Trust as nominee/beneficiary for each successor Defendant as bailor/bailee to streamline a purportedly hypothecated security interest "Secret Liens" over the Payment Intangible after acquired collateral unlawfully construed as "Proceeds" of Plaintiff's Real Property. Plaintiff is informed and believes, and thereon alleges that MERS only tracks and updates ownership of the Payment Intangible registered with the MERS database software system; MERS cannot transfer the beneficial right to the Tangible Accommodated Note instrument; a legitimate "True Sale" of a Tangible Note instrument can only be transferred in an ordinary course of business by proper negotiation for full value, transfer and delivery by operation of all applicable law. (Exhibit E) MERS Procedural Manual (Exhibit F) MERS Patent

20. Plaintiff is informed and believes, and thereon alleges that payment for full value of the entire instrument was executed in an ordinary course of business from JPMorgan Securities, LLC to Everett Financial, Inc.. There are no documents or records Defendants can be produced that demonstrate that prior to the August 30, 2019 closing date for GNMA 2019-097 Trust, the Tangible Note was duly indorsed, transferred and delivered to GNMA 2019-097 Trust in an ordinary course of business by operation of all applicable law, including all intervening transfers including any purported transfers in the personal property Payment Intangible. Nor can any documents or records be produced that demonstrate that prior to the August 30, 2019, the Deed of Trust was duly assigned, transferred and delivered to GNMA 2019-097 Trust, via the Custodian of Records, US Bank, NA, including all Secret Liens purportedly securing the Payment Intangible intervening transfers/assignments.

21. Plaintiff further alleges that any documents i.e. MERS Assignment of Deed of Trust that purport to transfer a hypothecated beneficial security interest over the Payment Intangible underlying collateral of the Tangible Note or Bill of Exchange to GNMA 2019-097 Trust after the Closing Date August 30, 2019 are void as a matter of law; no security interest in the Real Property was perfected in the name of any of the successor Defendants. The alleged holder of the Tangible Note is not the beneficiary of the Deed of Trust. The alleged

beneficiary of Plaintiff's Deed of Trust, MERS, does not have the requisite title, perfected security interest or standing to proceed in a foreclosure; and/or is not the real party in interest as agent or nominee to any action taken or to be taken against the Real Property by successor Defendants. Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned, any assignment of a Deed of Trust without proper transfer in an ordinary course of business of the Tangible Note that it secures is a legal nullity by operation of law. Plaintiff is informed and believes, and thereon alleges that the GNMA 2019-097 Trust had no officers or directors and no continuing duties other than to hold assets and to issue the series of certificates.

22. Plaintiff alleges that Defendants, and each of them, cannot establish possession, show proper receipt, transfer, negotiations, assignment and ownership of the Tangible Note or Deed of Trust, resulting in imperfect security interests and claims; therefore, none of the Defendants have perfected any colorable claim of title or security interest in the Real Property. Defendants, and each of them, cannot establish that the Deed of Trust purportedly securing the Tangle Note, were legally or properly acquired in accordance to all applicable law. Plaintiff therefore alleges, upon information and belief, that none of the parties to transaction, nor any of the Defendants in this case, hold a perfected and secured claim in the Real Property; and that all Defendants are equitably estopped and precluded from asserting an unsecured claim against Plaintiff's estate.

23. Plaintiff alleges that an actual controversy has arisen and now exists between the Plaintiff and Defendants, and each of them. Plaintiff desires a judicial determination and declaration of its rights about the Real Property and the corresponding Tangible Note and Deed of Trust.

24. Plaintiff also seek redress from Defendants identified herein for damages, for other injunctive relief, and for cancellation of written instruments based upon:

    a. An invalid and unperfected security interest in Plaintiff's Real Property hereinafter described;
    b. Void "True Sales;"
    c. An incomplete and ineffectual perfection of a security interest in Plaintiff's Real Property

**STATEMENT OF PERTINENT FACTS**

25. Plaintiff had a Forensic Chain of Title Securitization Analysis completed by qualified expert in to verify the claims of this complaint. (Exhibit I) Affidavit of Joseph Esquivel, Jr.

26. Plaintiff is the Superior Recorded owners of the Prime Market Property. (Exhibit A) Note.

27. Plaintiff was issued an Uncertificated Security to execute in the capacity of (Accommodation Party) to a Tangible Note Bill of Exchange on July 25, 2019 regarding a purported loan to (Accommodated Party) Everett Financial, Inc. for $183,612.00.

28. Defendant Everett Financial, Inc. is an account debtor Accommodated Party to a 26 U.S. Code § 1031 – Exchange of property held for productive use or investment.

29. Plaintiff herein alleges that the signatures on the Tangible Note Bill of Exchange instrument as the Accommodation party constitutes a **statutory capacity as Surety** for the Non-Depository Payor Bank, the original Accommodated secured party of record, acting as Trustee/Account Debtor pursuant to a Special Deposit 26 U.S. Code § 1031 – Exchange of property held for productive use or investment.

30. Plaintiff pledged a Constructive Deed of Trust granting Legal Title to Accommodate Everett Financial, Inc. to file against Plaintiff's Superior Claim to Title filed in the Official Records of the Fulton County Recorder's Office on August 13, 2019 as ins# 2019-0300239 Bk: 60398 Pg: 239 (Exhibit B) Deed of Trust.

31. The purported Mortgage loan contracts between the parties are specific as to the duties of each party.

32. On or before August 30, 2019, the Closing Date of the GNMA 2019-097 Trust, Plaintiff's Note was sold to the Trust.

33. There is no contemporaneous assignment of Plaintiff's Mortgage to the Trust as underlying security for Plaintiff's Note.

34. Plaintiff's Note and Mortgage are irreparably separated.

35. Any attempt to assign assets into a Trust after the Closing Date of the Trust is a violation of the terms of the Trust and is void.

36. To date, there is no assignment of Plaintiff's Mortgage to the Trust as underlying security for Plaintiff's Note. Plaintiff's Note and Mortgage are irreparably separated.

37. Plaintiff alleges that only the Depositor, Government National Mortgage Association, is the rightful party that can convey the asset into the trust pursuant to investor offering documents.

## PROPERTY

38. The Real Property description which is the subject of this suit is commonly known as 6470 St. Mark Way Fairburn, GA 30213.

## FIRST CAUSE OF ACTION:
## LACK OF STANDING/WRONGFUL FORECLOSURE

A.    **No Defendant Has Standing to Foreclose**

39. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

40. An actual controversy has arisen and now exists between Plaintiff and Defendants specified hereinabove, regarding their respective rights and duties, in that Plaintiff contends that Defendants, and each of them, do not have an equitable right to foreclose on the Property because Defendants, and each of them, have failed to perfect any security interest in the Real Property collateral, or cannot prove to the court they have a valid interest as a real party in interest to the underlying Deed of Trust. Thus, the purported power of sale, or power to foreclose non-judicially, by the above specified Defendants, and each of them, no longer applies.

41. Plaintiff requests this Court find that the purported power of sale contained in the Deed of Trust is a nullity by operation of law, because Defendants' actions in the processing, handling and attempted foreclosure of this §1031 - Exchange involved numerous fraudulent, false, deceptive and misleading practices, including, but not limited to, violations of State laws designed to protect borrowers, which has directly caused Plaintiff to be at an equitable disadvantage to Defendants, and each of them. Plaintiff further requests that title to the Real Property remain in Plaintiff's name during the pendency of this litigation and deem that any attempted sale of the Real Property is "unlawful and void".

B.    **Defendant MERS Cannot be a Real Party in Interest in a Securitized Mortgage**

42. Since the creation of Defendant's Deed of Trust, Defendant MERS was named the "nominee beneficiary" of the Deed of Trust.

43. Plaintiff is informed and believes, and thereon allege that Defendant MERS lacks the authority under its corporate charter to foreclose a Deed of Trust, or to own or transfer an interest in a Tangible Note debt obligation because MERS charter limits MERS' powers and duties to functioning as an electronic registration system of Payment Intangible Chattel Paper Transferable Records as the underlying collateral to the Tangible Note for Accommodation Bill of Exchange.

44. Plaintiff is informed and believes, and thereon allege that to conduct a foreclosure action, a person or entity must have legal capacity as interested party and standing.

45. The Tangible Note in this action identifies the entity to whom it accommodated, the Originator. Therefore, the Tangible Note herein cannot be transferred **in an ordinary course of business**; the attachments to the notice of default do not establish that indorsements were made, nor are there any other notices which establish that Tangible Note negotiation was executed in an ordinary course of business, nor are there any other notices which establish that the Originator sold the Tangible Note to another party for full value.

46. Furthermore, insofar as the parties to the §1031 - Exchange of Defendant's purported transfer off enforcement contract rights over the underlying Deed of Trust base their claim that the Tangible Note and underlying Security was negotiated by operation of law in an ordinary course of business to Defendant US Bank, NA, the Trustee of the § 1031 - Exchange herein, by the Originator, it is well established State law that the assignment of a Deed of Trust does not automatically assign the Tangible Note nor the underlying Payment Intangible Transferrable Record as the security interest is incident of the Tangible Note debt obligation.

47. Pursuant to State law, one must be able to prove their capacity of holder of the Tangible Note as one with rights acquired in an ordinary course of business to perfect the transfer of enforcement contract rights to the Deed of Trust instrument as collateral for a Tangible Note debt obligation. Without proper negotiation and physical transfer, the "true sale" of the Tangible Note is invalid as a fraudulent conveyance, or as an unsecured Tangible Note stripped fo the Real Property collateral.

48. Defendants MERS failed to submit documents authorizing MERS, as nominee beneficiary for the Originator, to assign the subject Deed of Trust to the Special Purpose Vehicle

trustee. Hence, MERS lacked authority as mere nominee beneficiary to assign Plaintiff's Deed of Trust, making any assignment from MERS defective.

49. Any attempt to transfer the beneficial interest of a trust deed without actual ownership of the underlying Tangible Note attached together in one with the underlying Payment Intangible Transferable Record, is void under law. Therefore, Defendant MERS cannot establish that it is entitled to assert a claim in this case. For this reason, as well as the other reasons set forth herein below, MERS cannot transfer an interest in Real Property, and cannot recover anything from Plaintiff. with unclean hands.

50. Defendants, and each of them, through the actions alleged above, claim the right to illegally commence foreclosure sale of Plaintiff's Real Property under the Deed of Trust on the Real Property via an *in-Rem* action supported by false or fraudulent documents. Said unlawful foreclosure action has caused and continues to cause Plaintiff great and irreparable injury in that Real Property is unique.

51. The wrongful conduct of the above specified Defendants, and each of them, unless restrained and enjoined by an Order of the Court, will continue to cause great and irreparable harm to Plaintiff. Plaintiff will not have the beneficial use and enjoyment of the Home and will lose the Property.

52. Plaintiff has no other plain, speedy or adequate remedy and the injunctive relief prayed for below is necessary and appropriate to prevent irreparable loss to Plaintiff. Plaintiff suffered and will continue to suffer unless Defendants' wrongful conduct is restrained and enjoined because Real Property is inherently unique and it will be impossible for Plaintiff to determine the precise amount of damage it will suffer.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
**(Against Defendant Everett Financial, Inc./MERS)**

53. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

54. The terms of the mortgage contract are clear.

55. Pursuant to paragraph 23 – Release, Defendant Everett Financial, Inc. and specifically MERS, their electronic agent, was obligated to satisfy, release and reconvey the beneficial security interest in Plaintiff's pledged Deed of Trust upon payment of all sums

associated with the release premium to Everett Financial, Inc. for Accommodated Party services rendered.

56. Defendant Everett Financial, Inc. was paid in full for their Accommodated capacity to the Tangible Note and Deed of Trust when it sold and relinquished its interest in Plaintiff's real property to Government National Mortgage Association

57. Defendant Everett Financial, Inc. failed to satisfy, release and reconvey the security instrument, thus breaching the terms found in paragraph 23 of the Deed of Trust.

## THIRD CAUSE OF ACTION
## QUIET TITLE

58. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

59. All Defendants named herein claim an interest and estate in the property adverse to Plaintiff in that Defendant asserts it is the owner of the note secured by the Deed of Trust to the property the subject of this suit.

60. All Defendants named herein claims an interest and estate in the Real Property adverse to Plaintiff in that Defendants' asserts to be the owner of Tangible Note secured by the Deed of Trust to the Real Property, the subject of this suit.

61. The claims of all Defendants are without any legal right whatsoever, and Defendants have no estate, title, lien or interest in or to the Real Property, or any part of the Real Property construed and hypothecated as "After Acquired Collateral" the Intangible Payment transferable record to the §1031 - Exchange.

62. The claim of all Defendants herein named, and each of them, claim some estate, right, title, lien or interest in or to the property adverse to Plaintiff's title, and these claims constitute a cloud on Plaintiff's title to the Real Property.

63. Plaintiff, therefore alleges upon information and belief, that none of the parties to the §1031 - Exchange transaction, nor any of the Defendants in this case hold a perfected and secured claim in the Real Property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiff's Real Property Estate.

64. Plaintiff requests the decree permanently enjoin Defendants, and each of them, and all persons claiming under them, from asserting any adverse claim to Plaintiff's title to the property; and

65. Plaintiff requests the court award Plaintiff's costs of this action, and such other relief as the court may deem proper.

## FOURTH CAUSE OF ACTION
## TEMPORARY RESTRAINING ORDER AND FOR INJUNCTIVE RELIEF

66. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

67. Plaintiff is the record title holder of the Property and are now being threatened with irreparable injury by the conduct of Defendants.

68. Plaintiff will continue to be in jeopardy of injury by the Defendants' wrongful conduct by the now threatened foreclosure sale, causing irreparable injury by denying them the right to maintain the status quo between the parties pending resolution of the present dispute.

69. Plaintiff has no adequate remedy at law for both the factual and threatened injuries herein described. Plaintiff's real property residence and rights involved are non-fungible and utterly unique so that it will be impossible to accurately measure in monetary terms, the damage caused by Defendants' wrongful conduct.

70. Defendants' numerous violations of federal and state statute and inability to establish a claim of right to Plaintiff's Note or Deed of Trust establishes Plaintiff's claim as more probable than not and Plaintiff will likely prevail at the time of trial.

71. Plaintiff requests that Defendants and its agents and employees be enjoined from prosecuting any continuance of a foreclosure sale pending trial.

## FIFTH CAUSE OF ACTION
## DECLARATORY RELIEF

72. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

73. An actual controversy has arisen and now exists between Plaintiff and Defendants specified hereinabove regarding Plaintiff's respective rights and duties in the subject note and security instrument. Plaintiff requests a judicial determination of the rights, obligations and interest of the parties regarding the subject property, and such determination is necessary and appropriate under the circumstances so that all parties may ascertain and know their rights, obligations and interests regarding the subject property.

74. Plaintiff should be the equitable owner of the Subject Property.

75. Plaintiff seeks to quiet title as of the date of the filing of this Complaint. Plaintiff seeks a judicial declaration that the title to the Subject Property is vested in Plaintiff alone and that the Defendants be declared to have no interest estate, right, title or interest in the subject property and that the Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the Subject Property subject to Plaintiff's rights.

**PRAYER**

WHEREFORE PREMISES CONSIDERED as Prayer for Relief, and for the foregoing reasons, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon final hearing, Plaintiff be awarded judgment:

• Declaring that Defendants lack any interest in the subject property which would permit them to foreclose, evict, or attempt to foreclose or evict, the trust deed and/or to sell the subject properties;

• Declaring that the trust deed is not a lien against the subject properties, ordering the immediate release of the trust deed of record, and quieting title to the subject properties in Plaintiff and against Defendants and all claiming by, through or under them;

• A refund of any wrongfully or improperly collected fees and payments to Defendants to which it had no right;

• Pre- and post-judgment interest at the maximum rate allowed by law;

• Attorney's fees;

• Monetary relief over $100,000 but not more than $10,000,000,00; and

• Such other and further relief at law and/or in equity to which Plaintiff may be justly entitled including but not limited to damages within the jurisdictional limits of this Court, together with pre-judgment and post-judgment interest as are allowed by law.

Dated: November 2, 2023

Jamaree James, Pro Se
6470 St. Mark Way
Fairburn, GA 30213

1

2

## **VERIFICATION**

I, Jamaree James, Pro se, am the Plaintiff in the above entitled matter and have personal
knowledge to testify to the matters stated therein. I have read the facts and allegations and
declare under penalty of perjury in and for the State of Georgia that the above is true and correct
to the best of my knowledge.

X ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Jamaree James, Pro Se
6470 St. Mark Way
Fairburn, GA 30213

On the ___6th___ day of ___November___ 2023, Jamaree James known to me appeared before me and
executed the above document.

NOTARY

My Commission expires on ___06/30/2025___



# **EXHIBITS**

Exhibit A:    Note

Exhibit B:    Deed of Trust

Exhibit C:    OCC Asset Securitization Manual, Pg. 23

Exhibit D:    Real Estate and the Tax Reform Act of 1986

Exhibit E:    MERS Procedural Manual

Exhibit F:    Certified Forensic Audit by Joseph Esquivel, Jr

Exhibit G:    Full Correspondence with Mr. Cooper

Exhibit H:    Trust Information

Exhibit I:    Additional Notes

# EXHIBIT "A"

Loan Number: 290190636280

MIN: 100307110012119918

**Multistate**

# NOTE

FHA Case Number:
**106-1993799-703**

**July 25, 2019**
(Date)

**FAIRBURN, GEORGIA**
(City, State)

6470 ST MARK WAY
FAIRBURN, GEORGIA 30213
(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$183,612.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING, A TEXAS CORPORATION.** I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **3.500%**. The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **September 1, 2019**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest and other items in the order described in the Security Instrument before Principal. If, on **August 1, 2049**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING
14801 QUORUM DRIVE, SUITE 300
DALLAS, TEXAS 75254

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$824.50**.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to any accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**MULTISTATE FHA Fixed Rate Note**

IDS, Inc.

1/2015-b



Loan Number: 290190636280                                    MIN: **100307110012119918**

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



Loan Number: 29019063628**0**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

MIN: 100307110012119918

JAMAREE JAMES

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

(Sign Original Only)

Loan originator (Organization): EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING; NMLS #: 2129
Loan originator (Individual): KENZIE FLOOD; NMLS #: 1507497

PAY TO THE ORDER OF:

WITHOUT RECOURSE
EVERETT FINANCIAL INC.,
DBA: SUPREME LENDING, A TEXAS CORPORATION

BY: _____
NAME: YOLANDA   MEDINA
TITLE: POST CLOSING MANAGER

MULTISTATE FHA Fixed Rate Note
IDS, Inc.

Page 3 of 3

1/2015-b



# EXHIBIT "B"

CariilA nS 2239G8221

Deed Book 60398 Pg  239
Filed and Recorded Aug-13-2019 07:53am
2019-0300239
Georgia Intangible Tax Paid $551.00
**CATHELENE  ROBINSON**
Clerk of Superior Court
Fulton County, Georgia

WHEN RECORDED, MAIL TO:
EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING
14801 QUORUM DRIVE, SUITE 300
DALLAS, TEXAS 75254

This instrument was prepared by:
EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING
14801 QUORUM DRIVE, SUITE 300
DALLAS, TEXAS 75254
214-340-5225

*Record and Return to:*
*The Hawes Law Firm, LLC*
*1110 Satellite Blvd, Suite 305*
*Suwanee, GA 30024*

Parcel ID Number: 07 -1501-0139-083-7

Loan Number: 290190636280

_____ (Space Above This Line For Recording Data) _____

## SECURITY DEED

| FHA Case Number: |
| 106-1993799-703 |

MIN: 100307110012119918
SIS Telephone #: (888) 679-MERS

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 15.

(A) "**Security Instrument**" means this document, which is dated **July 25, 2019**, together with all Riders to this document.

(B) "**Borrower**" is **JAMAREE JAMES, SINGLE MAN**. Borrower is the grantor under this Security Instrument.

(C) "**MERS**" is **Mortgage Electronic Registration Systems, Inc.** MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the grantee under this Security Instrument.** MERS is organized and existing under the laws of **Delaware**, and has an address and telephone number of **P.O. Box 2026, Flint, MI 48501-2026**, tel. **(888) 679-MERS**.

(D) "**Lender**" is **EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING**. Lender is **A TEXAS CORPORATION**, organized and existing under the laws of **TEXAS**.
Lender's address is **14801 QUORUM DRIVE, SUITE 300, DALLAS, TEXAS 75254**.

(E) "**Note**" means the promissory note signed by Borrower and dated **July 25, 2019**. The Note states that Borrower owes Lender ONE HUNDRED EIGHTY-THREE THOUSAND SIX HUNDRED TWELVE AND NO/100 Dollars (U.S. **$183,612.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 1, 2049**.

FHA Georgia Security Deed with MERS 1/2015

IDS, Inc - 59458

Page 1 of 10

Borrower(s) Initials J J _____



Deed Book 60398 Pg 240

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

☐ Adjustable Rate Rider      ☐ Condominium Rider      ☒ Planned Unit Development Rider
☒ Other(s) (specify): **Waiver of Borrower's Rights Rider,**

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his designee.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS, with power of sale, the following described property located in the County of **FULTON**:

     **SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".**

     Parcel ID Number: **07 -1501-0139-083-7**

     which currently has the address of   **6470 ST MARK WAY**
                                **FAIRBURN, GEORGIA 30213,**                         ("Property Address"):

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security

Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay

FHA Georgia Security Deed with MERS 1/2015

IDS, Inc - 59458

Page 3 of 10

Borrower(s) Initials _____



Deed Book 60398 Pg 24

to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall

FHA Georgia Security Deed with MERS 1/2015

IDS, Inc - 59458

Page 4 of 10

Borrower(s) Initials 

cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate

FHA Georgia Security Deed with MERS 1/2015

IDS, Inc - 59456

Page 5 of 10

Borrower(s) Initials _____



information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of





Deed Book 60398 Pg 24.

Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the monthly payment amount unless the Note holder agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

FHA Georgia Security Deed with MERS 1/2015

IDS, Inc - 59458

Page 7 of 10

Borrower(s) Initials ___



As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceedings; (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees





that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.**

**Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.**

**If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.**

---





Deed Book 60398 Pg 247

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

**25. Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

**26. Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.



_____ (Seal)          _____ (Seal)
JAMAREE JAMES                  -Borrower                                        -Borrower

STATE OF GEORGIA,                                              County ss:

Signed, sealed and delivered this _____ day of _____, 2019
in the presence of:

_____
Unofficial Witness

Witness my hand and seal this _____ day of _____, 2019.

_____
Notary Public,                          County,
State of **GEORGIA**

Loan originator (Organization): **EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING**; NMLS #: **2129**
Loan originator (Individual): **KENZIE FLOOD**; NMLS #: **1507497**

19-1675

### EXHIBIT "A"

All that tract or parcel of land lying and being in Land Lot 139, of the 7th District, of Fulton County, Georgia, being Lot 66, St Josephs Subdivision. Phase I, as per plat recorded in Plat Book 308, Pages 141 - 148, Fulton County, Georgia Records. which plat is incorporated herein and made a part hereof by this reference.

Also Known By Street and Number: **6470 St Mark Way, Fairburn, GA 30213**

Loan Number: **290190636280**

## GEORGIA WAIVER OF BORROWER'S RIGHTS RIDER

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE **RIGHT TO ACCELERATE** THE DEBT AND THE **POWER OF ATTORNEY** GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; **THIS MEANS THAT MY FAILURE TO MEET EVERY CONDITION OF THE MORTGAGE LOAN MAY RESULT IN THE LOSS OF MY PROPERTY THROUGH FORECLOSURE**, (2) **WAIVES** ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH OF THIS DEED, AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:



JAMAREE JAMES _____ -Grantor

_____ -Grantor

Signed, sealed and delivered in the presence of the two attesting witnesses:

Notary Public

Official Seal

_____ -Grantor

Unofficial Witness

_____ -Grantor

Loan Number: **290190636280**

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me on the date set forth above.

_____          _____
Notary Public                                      Closing Attorney

## FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. Section 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.



JAMAREE JAMES          7·25·19          _____
                       Date                              Date

Deed Book 60398 Pg 251

Loan Number: 290190636280

MIN: 100307110012119918
*FHA Case Number: 106-1993799-703*

# FHA PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **25th day of July, 2019**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note ("Note") to **EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING, A TEXAS CORPORATION** ("Lender") of the same date and covering the Property described in the Security Instrument and located at:

**6470 ST MARK WAY**
**FAIRBURN, GEORGIA 30213**
(Property Address).

The Property Address is a part of a planned unit development ("PUD") known as

**ST JOSEPHS**
(Name of Planned Unit Development).

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. So long as the Owners Association (or equivalent entity holding title to common areas and facilities), acting as trustee for the homeowners, maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the property located in the PUD, including all improvements now existing or hereafter erected on the mortgaged premises, and such policy is satisfactory to Lender and provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and other hazards included within the term "extended coverage," and loss by flood, to the extent required by the Secretary, then: (i) Lender waives the provision in Paragraph 3 of this Security Instrument

---

**FHA — MULTISTATE PUD Rider**  1/2015

IDS, Inc.

Page 1 of 2

Borrower(s) Initials 

for the monthly payment to Lender of one-twelfth of the yearly premium installments for hazard insurance on the Property, and (ii) Borrower's obligation under Paragraph 5 of this Security Instrument to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy. Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage and of any loss occurring from a hazard. In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by this Security Instrument, with any excess paid to the entity legally entitled thereto.

B. Borrower promises to pay all dues and assessments imposed pursuant to the legal instruments creating and governing the PUD.

C. If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph C shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.



_____ (Seal)          _____ (Seal)
JAMAREE JAMES          -Borrower                                  -Borrower

FHA — MULTISTATE PUD Rider                                                      1/2015

IDS, Inc.                          Page 2 of 2

Deed Book 60398 Pg 252
CATHELENE ROBINSON
Clerk of Superior Court
Fulton County, Georgia

# EXHIBIT "C"

**Offering Circular Supplement**
**(To Base Offering Circular dated March 1, 2017)**


*Ginnie* Mae
*Our Guaranty Matters*

# $1,603,954,773
# Government National Mortgage Association
# GINNIE MAE®

### Guaranteed REMIC Pass-Through Securities
### and MX Securities
### Ginnie Mae REMIC Trust 2019-097

## The Securities

The Trust will issue the Classes of Securities listed on the front cover of this offering circular supplement.

## The Ginnie Mae Guaranty

Ginnie Mae will guarantee the timely payment of principal and interest on the securities. The Ginnie Mae Guaranty is backed by the full faith and credit of the United States of America.

## The Trust and its Assets

The Trust will own (1) Ginnie Mae Certificates and (2) certain previously issued certificates.

**The securities may not be suitable investments for you. You should consider carefully the risks of investing in them.**

**See "Risk Factors" beginning on page S-10 which highlights some of these risks.**

The Sponsor and the Co-Sponsor will offer the securities from time to time in negotiated transactions at varying prices. We expect the closing date to be August 30, 2019.

You should read the Base Offering Circular as well as this Supplement.

The securities are exempt from registration under the Securities Act of 1933 and are "exempted securities" under the Securities Exchange Act of 1934.

| Class of REMIC Securities | Original Principal Balance(2) | Interest Rate | Principal Type(3) | Interest Type(3) | CUSIP Number | Final Distribution Date(4) |
|---|---|---|---|---|---|---|
| **Security Group 1** | | | | | | |
| CS | $100,000,000 | (5) | NTL(PT) | INV/IO | 38381YGZ1 | August 2049 |
| DF(1) | 100,000,000 | (5) | PT | FLT | 38381YHA5 | August 2049 |
| DT(1) | 100,000,000 | (5) | NTL(PT) | INV/IO | 38381YHB3 | August 2049 |
| **Security Group 2** | | | | | | |
| CZ | 16,878,733 | 3.00% | SUP | FIX/Z | 38381YHC1 | August 2049 |
| FA(1) | 38,755,091 | (5) | PT | FLT | 38381YHD9 | August 2049 |
| PA | 61,695,667 | 2.00 | PAC/AD | FIX | 38381YHE7 | May 2049 |
| PF | 17,627,333 | (5) | PAC/AD | FLT | 38381YHF4 | May 2049 |
| PS | 17,627,333 | (5) | NTL(PAC/AD) | INV/IO | 38381YHG2 | May 2049 |
| PZ | 685,995 | 3.00 | PAC/AD | FIX/Z | 38381YHH0 | August 2049 |
| SA | 38,755,091 | (5) | NTL(PT) | INV/IO | 38381YHJ6 | August 2049 |
| **Security Group 3** | | | | | | |
| CD(1) | 96,624,542 | 2.25 | SEQ | FIX | 38381YHK3 | October 2043 |
| GF(1) | 102,637,180 | (5) | PT | FLT | 38381YHL1 | August 2049 |
| GL | 50,000,000 | 2.25 | SEQ | FIX | 38381YHM9 | August 2049 |
| GS | 102,637,180 | (5) | NTL(PT) | INV/IO | 38381YHN7 | August 2049 |
| **Security Group 4** | | | | | | |
| FG | 150,000,000 | (5) | PT | FLT | 38381YHP2 | August 2049 |
| SL | 150,000,000 | (5) | NTL(PT) | INV/IO | 38381YHQ0 | August 2049 |
| **Security Group 5** | | | | | | |
| EA | 23,720,000 | 3.00 | SUP/AD | FIX | 38381YHR8 | August 2049 |
| ED | 5,290,000 | 3.00 | PAC II | FIX | 38381YHS6 | August 2049 |
| EZ | 3,581 | 3.00 | SUP/Z | FIX/Z | 38381YHT4 | August 2049 |
| FB | 33,952,064 | (5) | PT | FLT | 38381YHU1 | August 2049 |
| FP | 21,639,125 | (5) | PAC I/AD | FLT | 38381YHV9 | May 2049 |
| GZ | 1,586,804 | 3.00 | PAC I | FIX/Z | 38381YHW7 | August 2049 |
| PB | 151,473,875 | 2.50 | PAC I/AD | FIX | 38381YHX5 | May 2049 |
| SB | 33,952,064 | (5) | NTL(PT) | INV/IO | 38381YHY3 | August 2049 |
| SP | 21,639,125 | (5) | NTL(PAC I/AD) | INV/IO | 38381YHZ0 | May 2049 |
| **Security Group 6** | | | | | | |
| AG(1) | 22,000,000 | 2.50 | SEQ/AD | FIX | 38381YJA3 | September 2045 |
| AZ(1) | 3,000,000 | 2.50 | SEQ | FIX/Z | 38381YJB1 | August 2049 |
| MF | 100,000,000 | (5) | PT | FLT | 38381YJC9 | August 2049 |
| MS | 100,000,000 | (5) | NTL(PT) | INV/IO | 38381YJD7 | August 2049 |
| **Security Group 7** | | | | | | |
| AC | 280,075,000 | 3.50 | PAC/AD | FIX | 38381YJE5 | August 2049 |
| FC | 67,457,884 | (5) | PT | FLT | 38381YJF2 | August 2049 |
| SC | 67,457,884 | (5) | NTL(PT) | INV/IO | 38381YJG0 | August 2049 |
| ZC | 57,214,420 | 3.50 | SUP | FIX/Z | 38381YJH8 | August 2049 |
| **Security Group 8** | | | | | | |
| A(1) | 104,661,777 | 3.00 | SC/PT | FIX | 38381YJJ4 | February 2048 |
| **Security Group 9** | | | | | | |
| D(1) | 57,315,607 | 3.00 | SC/PT | FIX | 38381YJK1 | July 2048 |
| **Security Group 10** | | | | | | |
| J(1) | 39,661,095 | 3.50 | SC/PT | FIX | 38381YJL9 | May 2048 |
| **Residual** | | | | | | |
| RR | 0 | 0.00 | NPR | NPR | 38381YJM7 | August 2049 |

(1) These Securities may be exchanged for MX Securities described in Schedule I to this Supplement.

(2) Subject to increase as described under "Increase in Size" in this Supplement. The amount shown for each Notional Class (indicated by "NTL" under Principal Type) is its original Class Notional Balance and does not represent principal that will be paid.

(3) As defined under "Class Types" in Appendix I to the Base Offering Circular. The Class Notional Balance of each Notional Class will be reduced as shown under "Terms Sheet — Notional Classes" in this Supplement.

(4) See "Yield, Maturity and Prepayment Considerations — Final Distribution Date" in this Supplement.

(5) See "Terms Sheet — Interest Rates" in this Supplement.

**J.P. Morgan**

**Mischler Financial Group, Inc.**

The date of this Offering Circular Supplement is August 23, 2019.

## AVAILABLE INFORMATION

You should purchase the securities only if you have read and understood the following documents:

- this Offering Circular Supplement (this "Supplement"),

- the Base Offering Circular and

- in the case of the Group 8 through 10 securities, each disclosure document relating to the Underlying Certificates (the "Underlying Certificate Disclosure Documents").

The Base Offering Circular and the Underlying Certificate Disclosure Documents are available on Ginnie Mae's website located at http://www.ginniemae.gov.

If you do not have access to the internet, call BNY Mellon, which will act as information agent for the Trust, at (800) 234-GNMA, to order copies of the Base Offering Circular. In addition, you can obtain copies of any other document listed above by contacting BNY Mellon at the telephone number listed above.

Please consult the standard abbreviations of Class Types included in the Base Offering Circular as Appendix I and the glossary included in the Base Offering Circular as Appendix II for definitions of capitalized terms.

## TABLE OF CONTENTS

| | Page | | Page |
|---|---|---|---|
| Terms Sheet | S-3 | ERISA Matters | S-38 |
| Risk Factors | S-10 | Legal Investment Considerations | S-39 |
| The Trust Assets | S-13 | Plan of Distribution | S-39 |
| Ginnie Mae Guaranty | S-15 | Increase in Size | S-39 |
| Description of the Securities | S-15 | Legal Matters | S-39 |
| Yield, Maturity and Prepayment | | Schedule I: Available Combinations | S-I-1 |
| Considerations | S-19 | Schedule II: Scheduled Principal | |
| Certain United States Federal Income | | Balances | S-II-1 |
| Tax Consequences | S-35 | Exhibit A: Underlying Certificates | A-1 |

## TERMS SHEET

This terms sheet contains selected information for quick reference only. You should read this Supplement, particularly "Risk Factors," and each of the other documents listed under "Available Information."

**Sponsor:**  J.P. Morgan Securities LLC

**Co-Sponsor:**  Mischler Financial Group, Inc.

**Trustee:**  U.S. Bank National Association

**Tax Administrator:**  The Trustee

**Closing Date:**  August 30, 2019

**Distribution Date:**  The 20th day of each month or, if the 20th day is not a Business Day, the first Business Day thereafter, commencing in September 2019.

**Trust Assets:**

| Trust Asset Group | Trust Asset Type | Certificate Rate | Original Term To Maturity (in years) |
|---|---|---|---|
| 1 | Ginnie Mae II | 5.0% | 30 |
| 2 | Ginnie Mae II | 4.0% | 30 |
| 3 | Ginnie Mae II | 4.0% | 30 |
| 4 | Ginnie Mae II | 3.5% | 30 |
| 5 | Ginnie Mae II | 3.5% | 30 |
| 6 | Ginnie Mae II | 3.5% | 30 |
| 7 | Ginnie Mac II | 4.0% | 30 |
| 8 | Underlying Certificate | (1) | (1) |
| 9 | Underlying Certificate | (1) | (1) |
| 10 | Underlying Certificate | (1) | (1) |

(1)  Certain information regarding the Underlying Certificates is set forth in Exhibit A to this Supplement.

**Security Groups:**  This series of Securities consists of multiple Security Groups (each, a "Group"), as shown on the front cover of this Supplement and on Schedule I to this Supplement. Except in the case of a certain MX Class in Groups 2 and 3, payments on each Group will be based solely on payments on the Trust Asset Group with the same numerical designation.

**Assumed Characteristics of the Mortgage Loans Underlying the Group 1 through 7 Trust Assets[1]:**

| Principal Balance | Weighted Average Remaining Term to Maturity (in months) | Weighted Average Loan Age (in months) | Weighted Average Mortgage Rate[2] |
|---|---|---|---|
| **Group 1 Trust Assets** | | | |
| $100,000,000 | 354 | 4 | 5.517% |
| **Group 2 Trust Assets** | | | |
| $125,642,819 | 355 | 2 | 4.475% |
| 10,000,000 | 329 | 27 | 4.475% |
| $135,642,819 | | | |
| **Group 3 Trust Assets** | | | |
| $249,261,722 | 354 | 4 | 4.487% |
| **Group 4 Trust Assets** | | | |
| $150,000,000 | 359 | 1 | 4.013% |
| **Group 5 Trust Assets** | | | |
| $100,000,000 | 355 | 3 | 4.023% |
| 137,664,449 | 356 | 2 | 4.023% |
| $237,664,449 | | | |
| **Group 6 Trust Assets** | | | |
| $125,000,000 | 355 | 3 | 3.964% |
| **Group 7 Trust Assets** | | | |
| $404,747,304 | 355 | 3 | 4.506% |

---

[1] As of August 1, 2019.

[2] The Mortgage Loans underlying the Group 1 through 7 Trust Assets may bear interest at rates ranging from 0.25% to 1.50% per annum above the related Certificate Rate.

The actual remaining terms to maturity, loan ages and Mortgage Rates of many of the Mortgage Loans underlying the Group 1 through 7 Trust Assets will differ from the weighted averages shown above, perhaps significantly. *See "The Trust Assets — The Mortgage Loans" in this Supplement.*

**Characteristics of the Mortgage Loans Underlying the Group 8 through 10 Trust Assets:** See Exhibit A to this Supplement for certain information regarding the characteristics of the Mortgage Loans included in the related Underlying Trusts.

**Issuance of Securities:** The Securities, other than the Residual Securities, will initially be issued in book-entry form through the book-entry system of the U.S. Federal Reserve Banks (the "Fedwire Book-Entry System"). The Residual Securities will be issued in fully registered, certificated form. *See "Description of the Securities — Form of Securities" in this Supplement.*

**Modification and Exchange:** If you own exchangeable Securities you will be able, upon notice and payment of an exchange fee, to exchange them for a proportionate interest in the related Securities shown on Schedule I to this Supplement. *See "Description of the Securities — Modification and Exchange" in this Supplement.*

**Increased Minimum Denomination Classes:**   Each Class that constitutes a Principal Only or Interest Only Class. *See "Description of the Securities— Form of Securities" in this Supplement.*

**Interest Rates:**   The Interest Rates for the Fixed Rate Classes are shown on the front cover of this Supplement or on Schedule I to this Supplement.

The Floating Rate and Inverse Floating Rate Classes will bear interest at per annum rates based on one-month LIBOR (hereinafter referred to as "LIBOR") as follows:

| Class | Interest Rate Formula(1) | Initial Interest Rate(2) | Minimum Rate | Maximum Rate | Delay (in days) | LIBOR for Minimum Interest Rate |
|---|---|---|---|---|---|---|
| **Security Group 1** | | | | | | |
| CS . . . . . . . . . . . . . . . . . . . . . . | 4.48% − LIBOR | 2.21000% | 0.00% | 4.48% | 0 | 4.48% |
| CF . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.52% | 2.79000% | 0.52% | 5.00% | 0 | 0.00% |
| DF . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.50% | 2.77000% | 0.50% | 5.00% | 0 | 0.00% |
| DT . . . . . . . . . . . . . . . . . . . . . . | 4.50% − LIBOR | 0.02000% | 0.00% | 0.02% | 0 | 4.50% |
| **Security Group 2** | | | | | | |
| FA . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.40% | 2.59500% | 0.40% | 6.50% | 0 | 0.00% |
| PF . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.40% | 2.59500% | 0.40% | 6.50% | 0 | 0.00% |
| PS . . . . . . . . . . . . . . . . . . . . . . | 6.10% − LIBOR | 3.90500% | 0.00% | 6.10% | 0 | 6.10% |
| SA . . . . . . . . . . . . . . . . . . . . . . | 6.10% − LIBOR | 3.90500% | 0.00% | 6.10% | 0 | 6.10% |
| **Security Group 3** | | | | | | |
| GF . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.40% | 2.59500% | 0.40% | 6.50% | 0 | 0.00% |
| GS . . . . . . . . . . . . . . . . . . . . . . | 6.10% − LIBOR | 3.90500% | 0.00% | 6.10% | 0 | 6.10% |
| **Security Groups 2 and 3** | | | | | | |
| FT . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.40% | 2.59500% | 0.40% | 6.50% | 0 | 0.00% |
| **Security Group 4** | | | | | | |
| FG . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.69% | 2.91300% | 0.69% | 3.50% | 0 | 0.00% |
| SL . . . . . . . . . . . . . . . . . . . . . . | 2.81% − LIBOR | 0.58700% | 0.00% | 2.81% | 0 | 2.81% |
| **Security Group 5** | | | | | | |
| FB . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.45% | 2.67300% | 0.45% | 6.50% | 0 | 0.00% |
| FP . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.45% | 2.67300% | 0.45% | 6.50% | 0 | 0.00% |
| SB . . . . . . . . . . . . . . . . . . . . . . | 6.05% − LIBOR | 3.82700% | 0.00% | 6.05% | 0 | 6.05% |
| SP . . . . . . . . . . . . . . . . . . . . . . | 6.05% − LIBOR | 3.82700% | 0.00% | 6.05% | 0 | 6.05% |
| **Security Group 6** | | | | | | |
| MF . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.67% | 2.88125% | 0.67% | 3.75% | 0 | 0.00% |
| MS . . . . . . . . . . . . . . . . . . . . . . | 3.08% − LIBOR | 0.86875% | 0.00% | 3.08% | 0 | 3.08% |
| **Security Group 7** | | | | | | |
| FC . . . . . . . . . . . . . . . . . . . . . . | LIBOR + 0.40% | 2.62300% | 0.40% | 6.50% | 0 | 0.00% |
| SC . . . . . . . . . . . . . . . . . . . . . . | 6.10% − LIBOR | 3.87700% | 0.00% | 6.10% | 0 | 6.10% |

(1) LIBOR will be established on the basis of the ICE LIBOR method, as described under "Description of the Securities — Interest Distributions — Floating Rate and Inverse Floating Rate Classes" in this Supplement.

(2) The initial Interest Rate will be in effect during the first Accrual Period; the Interest Rate will adjust monthly thereafter.

**Allocation of Principal:**   On each Distribution Date for a Security Group, the following distributions will be made to the related Securities:

### SECURITY GROUP 1

The Group 1 Principal Distribution Amount will be allocated to DF, until retired

### SECURITY GROUP 2

The Group 2 Principal Distribution Amount, the CZ Accrual Amount and the PZ Accrual Amount will be allocated as follows:

• The PZ Accrual Amount in the following order of priority:

    1. Concurrently, to PA and PF, pro rata, until retired

    2. To PZ, until retired

• The CZ Accrual Amount in the following order of priority:

    1. To PA, PF and PZ, until reduced to their Aggregate Scheduled Principal Balance for that Distribution Date, in the following order of priority:

        a. Concurrently, to PA and PF, pro rata, until retired

        b. To PZ, until retired

    2. To CZ, until retired

• The Group 2 Principal Distribution Amount, concurrently, as follows:

    1. 28.5714284661% to FA, until retired

    2. 71.4285715339% in the following order of priority:

        a. To PA, PF and PZ, until reduced to their Aggregate Scheduled Principal Balance for that Distribution Date, in the following order of priority:

            i. Concurrently, to PA and PF, pro rata, until retired

            ii. To PZ, until retired

        b. To CZ, until retired

        c. To PA, PF and PZ, in the same manner and priority described in step 2.a. above, without regard to their Aggregate Scheduled Principal Balance, until retired

### SECURITY GROUP 3

The Group 3 Principal Distribution Amount will be allocated, concurrently, as follows:

1. 41.1764707298% to GF, until retired

2. 58.8235292702% sequentially, to CD and GL, in that order, until retired

### SECURITY GROUP 4

The Group 4 Principal Distribution Amount will be allocated to FG, until retired

## SECURITY GROUP 5

The Group 5 Principal Distribution Amount, the EZ Accrual Amount and the GZ Accrual Amount will be allocated as follows:

- The EZ Accrual Amount, sequentially, to EA and EZ, in that order, until retired

- The GZ Accrual Amount in the following order of priority:

    1. Concurrently, to FP and PB, pro rata, until retired

    2. To GZ, until retired

- The Group 5 Principal Distribution Amount, concurrently, as follows:

    1. 14.2857142256% to FB, until retired

    2. 85.7142857744% in the following order of priority:

    a. To FP, GZ and PB, until reduced to their Aggregate Scheduled Principal Balance for that Distribution Date, in the following order of priority:

        i. Concurrently, to FP and PB, pro rata, until retired

        ii. To GZ, until retired

    b. To ED, until reduced to its Scheduled Principal Balance for that Distribution Date

    c. Sequentially, to EA and EZ, in that order, until retired

    d. To ED, without regard to its Scheduled Principal Balance, until retired

    e. To FP, GZ and PB, in the same manner and priority described in step 2.a. above, without regard to their Aggregate Scheduled Principal Balance, until retired

## SECURITY GROUP 6

The Group 6 Principal Distribution Amount and the AZ Accrual Amount will be allocated as follows:

- The AZ Accrual Amount, sequentially, to AG and AZ, in that order, until retired

- The Group 6 Principal Distribution amount, concurrently, as follows:

    1. 80% to MF, until retired

    2. 20% sequentially, to AG and AZ, in that order, until retired

## SECURITY GROUP 7

The Group 7 Principal Distribution Amount and the ZC Accrual Amount will be allocated as follows:

- The ZC Accrual Amount in the following order of priority:

    1. To AC, until reduced to its Scheduled Principal Balance for that Distribution Date

    2. To ZC, until retired

- The Group 7 Principal Distribution Amount, concurrently, as follows:

    1. 16.6666666667% to FC, until retired

2. 83.3333333333% in the following order of priority:

    a. To AC, until reduced to its Scheduled Principal Balance for that Distribution Date

    b. To ZC, until retired

    c. To AC, without regard to its Scheduled Principal Balance, until retired

## SECURITY GROUP 8

The Group 8 Principal Distribution Amount will be allocated to A, until retired

## SECURITY GROUP 9

The Group 9 Principal Distribution Amount will be allocated to D, until retired

## SECURITY GROUP 10

The Group 10 Principal Distribution Amount will be allocated to J, until retired

**Scheduled Principal Balances:** The Scheduled Principal Balances or Aggregate Scheduled Principal Balances for the Classes listed below are included in Schedule II to this Supplement. They were calculated using among other things the following Structuring Ranges:

| | Structuring Ranges |
| --- | --- |
| **PAC Classes** | |
| AC ........................................... | 175% PSA through 325% PSA |
| PA, PF and PZ (in the aggregate) ................... | 125% PSA through 250% PSA |
| **PAC I Classes** | |
| FP, GZ and PB (in the aggregate) ................... | 125% PSA through 200% PSA |
| **PAC II Class** | |
| ED ........................................... | 137% PSA through 200% PSA |

**Accrual Classes:** Interest will accrue on each Accrual Class identified on the front cover of this Supplement at the per annum rate set forth on that page. However, no interest will be distributed to the Accrual Classes as interest. Interest so accrued on each Accrual Class on each Distribution Date will constitute an Accrual Amount, which will be added to the Class Principal Balance of that Class on each Distribution Date and will be distributable as principal as set forth in this Terms Sheet under "Allocation of Principal."

**Notional Classes:** The Notional Classes will not receive distributions of principal but have Class Notional Balances for convenience in describing their entitlements to interest. The Class Notional Balance of each Notional Class represents the percentage indicated below of, and reduces to that extent with, the Class Principal Balances indicated:

| Class | Original Class Notional Balance | Represents Approximately |
| --- | --- | --- |
| **Security Group 1** | | |
| CS .............................. | $100,000,000 | 100% of DF (PT Class) |
| DT .............................. | 100,000,000 | 100% of DF (PT Class) |

| Class | Original Class Notional Balance | Represents Approximately |
|---|---|---|
| **Security Group 2** | | |
| PS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 17,627,333 | 100% of PF (PAC/AD Class) |
| SA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38,755,091 | 100% of FA (PT Class) |
| **Security Group 3** | | |
| GS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $102,637,180 | 100% of GF (PT Class) |
| IC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 54,351,304 | 56.25% of CD (SEQ Class) |
| **Security Group 4** | | |
| SL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $150,000,000 | 100% of FG (PT Class) |
| **Security Group 5** | | |
| SB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 33,952,064 | 100% of FB (PT Class) |
| SP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21,639,125 | 100% of FP (PAC I/AD Class) |
| **Security Group 6** | | |
| MS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $100,000,000 | 100% of MF (PT Class) |
| **Security Group 7** | | |
| SC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 67,457,884 | 100% of FC (PT Class) |
| **Security Group 8** | | |
| BI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 39,248,166 | 37.5% of A (SC/PT Class) |
| **Security Group 9** | | |
| DI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 19,105,202 | 33.3333333333% of D (SC/PT Class) |
| **Security Group 10** | | |
| JI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 15,864,438 | 40% of J (SC/PT Class) |

**Tax Status:** Double REMIC Series. *See "Certain United States Federal Income Tax Consequences" in this Supplement and in the Base Offering Circular.*

**Regular and Residual Classes:** Class RR is a Residual Class and represents the Residual Interest of the Issuing REMIC and the Pooling REMIC. All other Classes of REMIC Securities are Regular Classes.

# EXHIBIT "D"

NBER WORKING PAPER SERIES

REAL ESTATE AND THE
TAX REFORM ACT OF 1986

Patric H. Hendershott

James R. Follian

David C. Ling

Working Paper No. 2098

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
December 1986

The research reported here is part of the NBER's research program
in Taxation.  Any opinions expressed are those of the authors and
not those of the National Bureau of Economic Research.

NBER Working Paper #2098
December 1986

Real Estate and the Tax Reform Act of 1986

## ABSTRACT

In contrast to the conventional wisdom, real estate activity in the aggregate is not disfavored by the 1986 Tax Act. Within the broad aggregate, however, widely different impacts are to be expected. Regular rental and commercial activity will be slightly disfavored, while historic and old rehabilitation activity will be greatly disfavored. In contrast, owner-occupied housing, far and away the largest component of real estate, is favored, both directly by an interest rate decline and indirectly owing to the increase in rents. Low-income rental housing may be the most favored of all real estate activities.

The rent increase for residential properties will be 10 to 15 percent with our assumption of a percentage point decline in interest rates. For commercial properties, the expected rent increase is 5 to 10 percent. The market value decline, which will be greater the longer and further investors think rents will be below the new equilibrium, is unlikely to exceed 4 percent in fast growth markets, even if substantial excess capacity currently exists. In no-growth markets with substantial excess capacity, market values could decline by as much as 8 percent from already depressed levels.

Average housing costs will decrease slightly for households with incomes below about $60,000, but increase by 5 percent for those with incomes above twice this level. With the projected increase in rents, homeownership should rise for all income classes, but especially for those with income under $60,000. The aggregate home ownership rate is projected to increase by three percentage points in the long run in response to the Tax Act.

The new passive loss limitations are likely to lower significantly the values of recent loss-motivated partnership deals and of properties in areas where the economics have turned sour (vacancy rates have risen sharply). The limitations should have little impact on new construction and market rents, however. Reduced depreciation write-offs, lower interest rates, and higher rents all act to lower expected passive losses. Moreover, financing can be restructured to include equity-kickers or less debt generally at little loss of value.

Patric H. Hendershott
Galbreath Professor
The Ohio State Univ.
1775 College Road
Columbus, Ohio  43210
(614) 292-0552

James R. Follain
The Office of Real Estate Res.
430 Commerce West
1206 South 6th Street
University of Illinois
Champaign-Urbana, Il  61820
(217) 244-0952

David C. Ling
Cox School of Business
Southern Methodist Univ.
Dallas, Texas  75275
(214) 692-2785

# Real Estate and The Tax Reform Act of 1986

Patric H. Hendershott
James R. Follain
David C. Ling

The U.S. Congress passed the Tax Reform Act of 1986 (the Act) on September 27 and President Reagan signed it into law on October 22.  This bill, which is the outcome of a process that began several years ago and included numerous tax reform proposals, radically alters the federal income tax system and generally taxes investment activities more heavily.  In fact, partial equilibrium analysis leads to the implausible conclusion that tax reform will reduce investment in all capital goods.  Reduced investment in relatively disadvantaged capital goods and increased investment in relatively advantaged goods would be a more plausible outcome.

The mechanism by which a general decline in investment is converted into a mixed investment response is a fall in interest rates. .This fall would follow directly from a general reduction in the demand for investable funds. Allowing for an interest rate decline significantly alters the expected impact of the Act upon real estate.  In particular, one finds that depreciable real estate will be negatively affected by the Act, but the effect is much less negative when one factors in the interest rate decline.  Moreover, owner-occupied housing shifts from being unfavorably affected to being favorably affected when a decline in interest rates is incorporated into the analysis.[1]

The analysis begins with a discussion of the main provisions of the Act and their implications for interest rates.  In Section II, we turn to the anti-tax shelter provisions of the bill:  passive loss and interest expense limitations and changes in at-risk rules and the minimum tax.  Sections III and IV report the likely effects of the Act upon income-producing properties (market rent levels and real estate values) and owner-occupied housing (the cost of ownership and the aggregate ownership rate).  The provisions for low-income housing are discussed in Section V, and a summary concludes the paper.

-2-

I.  Major Provisions of the Act and Their Implications for Interest Rates

Three classes of provisions are considered in turn:  individual income
tax rates, tax depreciation schedules, and investment tax credits.  The likely
interest-rate impact of these provisions is then discussed.

A.  Individual Tax Rate Schedule

The new law replaces the previous 14-bracket tax rate schedule with what
is best viewed as a 4-bracket rate schedule.  These four rates are 15, 28, 33,
and 28 percent.  The rate schedule for nonitemizing households is drawn in
Figure 1.  The 33 percent marginal rate reverts to 28 percent when a
household's average tax rate on all income above the standard deduction equals
28 percent (when area B in the figure equals area A).  That is, the benefits of
the zero tax rate on personal exemptions and of the initial 15 percent tax rate
will be phased out for taxpayers with sufficiently high incomes, the phase-out
mechanism being a five percent surcharge -- giving the 33 percent marginal rate
-- on income above the indicated level in Figure 1.  The new rate schedule
takes effect in 1988 and will be adjusted for inflation beginning in 1989.  A
transitional tax rate schedule that consists of five tax rates ranging from
11.5 percent to 38.5 percent will be in effect in 1987.

Breakpoints for the tax bracket changes are shown at the bottom of the
figure (in thousands of dollars) for four household types:  married couples
with two dependents, married couples with no dependents, "other" household
heads with one dependent, and single households.  The first breakpoint for
nonitemizers is governed by the standard deduction and the personal exemptions
(for itemizers, more of AGI goes untaxed, so all breakpoints would be further
to the right).  The Tax Reform Act increases the standard deduction (zero
bracket amount) by about a quarter (to $5,000 in 1988) for marrieds filing
jointly, by a full two-thirds (to $4,400) for heads of household, and by an

Figure 1

Tax Rate Schedule for Nonitemizers, 1988



| | | | |
|---|---|---|---|
| Married, 2 dep. | 12.8 (8.4) 42.6 | 84.7 | 205.7 | Adjusted |
| Married, 0 dep. | 8.9 (6.1) 38.7 | 80.8 | 180.0 | Gross |
| Other, 1 dep. | 8.3 (3.8) 32.2 | 70.0 | 153.9 | Income |
| Single | 4.9 (2.6) 22.8 | 48.1 | 105.5 | |

-3-

eighth (to $3,000) for singles.  The personal exemption will be increased
gradually until 1989 at which time the exemption will equal $2,000 for the
taxpayer, the taxpayer's spouse and dependents.  The standard deduction and the
personal exemption amounts will be adjusted annually for inflation beginning in
1989 and 1990, respectively.  The numbers in parentheses following the first
breakpoint represent the extrapolated 1988 income levels at which nonitemizers
would have begun paying taxes under the old law (standard deduction plus 4,2,2
and 1 personal exemptions, respectively, for the four households).  The
substantial increases under the new law are expected to remove 6 million
households from the federal income tax rolls.

     The reductions in statutory tax rates, including the near doubling of the
personal exemption, significantly lower both the average and marginal tax rates
at which households will deduct housing expenses.  Table 1 contains some sample
calculations for households with different adjusted gross incomes.  While the
calculations are based on numerous specific assumptions (married couples with
two dependents, etc.), the general result -- a cut in these tax rates -- holds
for virtually all households.[2]

     The Tax Act also alters the tax rate on capital gains income.  In 1988
and beyond, the general capital gains exclusion will not exist (in 1987,
capital gains will be taxed at no more than a 28 percent tax rate).  For most
households with significant assets other than consumer durables and their
residence, the capital gains rate will be increased from 20 percent or less to
28 or 33 percent.  The effective exemption of capital gains taxation on owner-
occupied housing continues unaltered, however.  That is, capital gains taxation
on owner-occupied housing can be totally postponed upon sale by purchasing
another home of at least equal value; in addition, a one-time capital gain of
up to $125,000 is excluded from taxation for taxpayers above the age of 55.

-4-

### B.  Depreciation Schedules

Economists have argued that tax depreciation should equal economic depreciation at replacement cost.  This generally means relatively low tax depreciation in the early years of a property but much higher depreciation in later years if significant inflation exists.  Because depreciation allowances would be inflation-indexed, more than 100 percent (possibly far more) of an asset's value would be deductible over its life.  Legislators have not bought this argument in practice, although they seem to have accepted it in principle.  More specifically, when inflation became rampant in 1979 and 1980, tax depreciation lives were sharply shortened (by ERTA) to offset the inflation.  Since then, inflation has fallen and depreciation lives for industrial and commercial structures have been lengthened (from 15 to 19 years).  The 1986 Act continues this lengthening.

Under previous law, residential rental property could be depreciated over 19 years using a 175 percent declining balance method with a switch to straight line in about the ninth year.  Nonresidential property could use either straight line or the 175 percent declining balance method, but given the severity of the recapture provisions for those who used the accelerated procedure, most nonresidential property was depreciated using straight line.  Equipment was depreciated over 5 years, on average, and public utility structures over 10 or 15 years;  150 percent declining balance with a switch to straight line was applicable to both asset types.

Under the new law, residential rental property is depreciable over 27.5 years and nonresidential property over 31.5 years.  The depreciation method is straight line, and the recapture provisions are eliminated.  Tax lives for public utility structures are lengthened to 15 or 20 years (still 150% DB).  While tax lives of equipment are lengthened, a more accelerated method (200% DB versus the old 150% DB) is available.  The net result is roughly no change in

-5-

the preser.: value of tax depreciation allowances.  Finally, construction period interest and property tax expenses are added to the basis of the property; consequently, they will be amortized over either 27.5 or 31.5 years versus the 10 years under previous law.

### C.  Tax Credits

Under the old law, tax credits existed for equipment, public utility structures, and rehabilitation expenditures on qualified properties.  The latter included historic structures and nonresidential old (over 40 years) and quasi-old (over 30 years) structures.  The credits were 10 percent for equipment and public utility structures, 15 percent for quasi-old rehabilitation outlays, 20 percent for old rehabs and 25 percent for historic structures.  The depreciation basis was reduced by the full credit for the nonresidential rehabs and by half the credit for equipment and public utility and historic structures.

The new bill removes the credits for equipment, public utility structures, and rehabs of buildings built after 1936.  For historic structures, the credit is cut from 25 to 20 percent, and the depreciable basis must now be reduced by the full credit.  For old qualifying properties, the credit is lowered from 20 to 10 percent.[3]  Our calculations suggest that assets which lose, partially or totally, their tax credits are the investment activities most disadvantaged by the Tax Reform Act.

### D.  Tax Reform and Interest Rates

The Tax Reform Act of 1986 has negative direct implications for every type of capital good.  Longer depreciation lives raise the investment hurdle rates (annual rental costs) for all structures except owner-occupied housing, and the reduction or elimination of investment tax credits increases hurdle

-6-

rates for equipment, public utility structures, and rehabilitation projects. Finally, the cut in personal tax rates lowers the demands for depreciable real estate and owner-occupied housing. With the demand for all investment goods falling, interest rates will certainly decline. The magnitude of the decline depends on the interest sensitivities of both the supply of domestic and foreign saving and of investment demand itself. Hendershott (1986) has constructed a model in which total saving is independent of interest rates and the demands for capital are approximately unitary elastic with respect to the rental prices of capital goods. In this model, interest rates have to decline by 1.4 percentage points to offset the negative capital provisions of the Act. That is, rates have to decline by this much to maintain aggregate investment at its pre-reform level. A similar calculation with the more detailed Galper-Lucke-Toder model (1986) yields a 1.74 percentage point decline.

Of course, interest rates will decline less if the supply of saving is reduced, and a reduction might be expected. On the domestic side, the deductibility of contributions to retirement accounts has been limited. IRA contributions for those with established pensions will no longer be deductible for households with incomes above $35,000 (singles) or $50,000 (married couples). Also, the maximum deductible annual contributions to supplemental retirement accounts (401k's) has been lowered from $30,000 to $7,000 (a similar reduction occurs for 403b's). On the foreign side, any reduction in U.S. interest rates reduces returns to foreigners because they pay taxes based on foreign tax schedules, not U.S. schedules, and thus do not benefit from lower U.S. tax rates. However, international capital flows are not infinitely elastic, and even if they were, the U.S. is sufficiently large that its reduced investment demand would lower the world level of interest rates.

-7-

In the calculations reported in Sections III and IV, a one (not 1.4 or 1.76) percentage point decline in U.S. interest rates is presumed. This does not mean that interest rates should be expected to decline (abstracting from other factors affecting interest rates) by 100 basis points from levels on the Act's enactment date;  some of the rate decline likely occurred earlier in 1986.  All tax reform plans considered in 1986 proposed elimination of the investment tax credit for equipment and public utility structures retroactive to the beginning of 1986, and the likelihood of some version of tax reform passing was high virtually all year.  Thus the decline in interest rates and the weakness in equipment expenditures experienced in 1986 was partially attributable to the anticipated removal of this provision.  Indeed, 75 basis points of 140 basis point model-calculated decline in interest rates is due solely to the elimination of this credit.  Real estate likely benefited from tax-reform induced lower interest rates during much of 1986.

## II.  Anti-Tax Shelter Provisions

The Tax Reform Act of 1986 contains multiple attacks on tax shelter activities:  (1) the establishment of a new income category (passive income), the losses from which are generally not deductible against other income, (2) a tightening of the limitations on interest expenses, (3) application of the at-risk rules to real estate, but with major exceptions, and (4) an expansion of the individual minimum tax.  Each of these is discussed in turn.  The section concludes with an analysis of the market impacts of these changes.

### A.  Passive Loss Limitations

For many years, different sources of income have been taxed differently under the federal tax code. For example, until 1981, "unearned" (nonlabor) income was subject to a far higher maximum tax rate than was "earned" or labor

-8-

income.  Also, capital gains have generally been taxed less heavily than other income, owning both to the gains exclusion and deferral until realization. Moreover, portfolio capital losses, while fully deductible against portfolio capital gains, have been deductible against only $3,000 of other income.

The 1986 Act introduces a new income class, passive income, and puts restrictions somewhat analogous to those on portfolio capital losses on passive losses.  Passive income is defined to include income generated from business and trade activities in which the taxpayer does not materially participate and from rental activities such as real estate.  For individuals, partnerships, trusts, and personal service corporations, losses from passive activities can be used to offset income from other passive activities, but not other income (e.g., wages, interest, etc.).  Losses that cannot be claimed in a particular year can be "banked" and used to offset passive income in future years.  Also, cumulative losses are allowed in full at the time of sale of the property if a gain or loss is recognized.  The effective date for this provision is January 1, 1987, but a transition period was established for properties purchased before the law was signed by the President.  The transition rule allows 65 percent of passive losses to be used to offset nonpassive income in 1987, 40 percent in 1988, 20 percent in 1989, and 10 percent in 1990.

An important exception applies to "small landlords."  Taxpayers who actively manage residential rental investments may deduct up to $25,000 in losses against nonpassive income if their adjusted gross income computed without regard to the losses is less than $100,000.  This amount is phased out one dollar for two dollars of income for taxpayers with incomes above $100,000 so that no losses are allowed for anyone who earns above $150,000.  An identical exemption applies to tax credits in a deduction-equivalent sense; that is, $7,000 in credits is allowed because a $7,000 credit is equivalent to a $25,000 deduction for a taxpayer with a 28 percent tax rate ($25,000x.28 =

-9-

$7,000).  Active management requires that a taxpayer have at least a 10 percent interest in the property (and not be a limited partner) and be involved in the management of the property on a "substantial and continual" basis.

Two related rationales for the small landlord provision can be provided. The first is based upon uncertainty regarding the true nature of the income from actively-managed properties.  With active management, some of the income is earned income and thus should be aggregatable with other earned income.  The second rationale reflects the difficulties of real estate diversification for small investors attempting to use their management/maintenance skills. Diversification (by geographic area and real estate type) becomes particularly important when passive losses are deductible against only passive gains. Without diversification, large losses can more easily occur.  While equity mutual funds allow small equity investors to easily diversify, real estate diversification for small managers/maintainers is impossible.

Other potentially important exceptions apply to certain types of corporations.  Regular C Corporations are not subject to the rule so they will be able to use passive losses to offset both regular and portfolio income of the corporation.  Closely held C corporations other than personal service corporations that are subject to the at-risk rules (generally where 5 or fewer individuals own more than 50 percent of the stock) can use passive losses to offset earned income, but not portfolio income (unearned income other than passive income).

-10-

## B.   Interest Expense Limitations

Previous law employed the concept of net investment income (investment income less investment expense) and investment interest expense (interest expense associated with investment income) to limit the amount of investment interest expense a taxpayer could deduct.  The limit equalled $10,000 plus the amount of the taxpayer's net investment income.  The new law will tighten the limitation by restricting the amount of investment interest expense that can be deducted to net investment income.  Excess interest expense can be banked for possible deduction in future years, and the four-year transition period for passive losses applies.

In general, interest expense and income (losses) for passive activities will not be included in the calculation of investment income or investment interest expense, i.e., real estate is not subject to the interest expense limitation.  However, during the transition period passive losses allowed (e.g., 65 percent in 1987) will be subtracted from investment income.  Thus, a taxpayer for whom the investment interest expense limitation is binding will not obtain any relief from the transition rule for the passive losses.

The new law prohibits the deduction of nonbusiness household interest except that on debt secured by first and second residences.  Moreover, this interest is limited to that on mortgage debt which does not exceed the sum of the original purchase price of the properties, the cost of improvements, and (up to the current market value of the properties) educational and medical expenses incurred.  The mortgage debt ceiling applies only to debt incurred after August 15, 1986.  The prohibitions on nonmortgage, nonbusiness household interest deductions are subject to the four-year transition period for passive losses.

-11-

### C.  At Risk Rules

At risk rules limit the cummulated deductible losses on an investment to the amount at risk (initial equity contribution plus cummulated taxable income less cummulated cash distributions plus recourse debt).  To the extent that cummulative losses exceed investment at risk, the losses can be banked for future possible deductibility.  Under old law, real estate was exempt from the at-risk rule.

The Tax Act extends the at-risk rules to real estate but simultaneously expands the definition of the amount at risk for real property to include nonrecourse debt secured by the property, including debt supplied on commercially reasonable terms by a lender with an equity interest in the property.  Seller or installment sale financing, however, is not treated as nonrecourse debt.  While this extension will obviously discourage seller financing, no general impact on the real estate market seems likely.

### D.  The Individual Minimum Tax[4]

Individuals must pay the higher of their regular tax liability or their minimum tax liability.  The latter is 21 percent of their income base -- regular taxable income plus specified tax preferences less a $40,000 exemption for married taxpayers ($30,000 for singles or individual filers).  The exemption is reduced 25 cents for each dollar by which the income base exceeds $150,000; during this phase out, the effective tax rate is 26.5 percent.

The 1986 Act expands the list of tax preferences to include "accelerated depreciation" on equipment (the difference between 200% DB and 150% DB), tax-exempt interest on new private activity bonds (those issued after August 7, 1986), and the appreciation component of charitable contributions.  These expansions will increase the likelihood of taxpayers paying the minimum tax. However, the real estate tax preferences are reduced because accelerated

-12-

depreciation and excluded capital gains on real estate no longer exist.  Still
remaining is the excess of tax depreciation over 40-year straight line.  This
could reduce the value of tax depreciation allowances by a sixth.[5]  Also, the
reduction in taxable income resulting from an installment sale is a tax
preference item.  Moreover, during the transition period passive losses allowed
(e.g., 65 percent in 1987) will be included in the minimum tax.

### E.  Impacts of Anti-Shelter Provisions

Of all the anti-shelter provisions, only the new passive loss rules could
plausibly affect real estate markets significantly.  Four areas of possible
impact include:  market rents, the volume of transactions, the form of
financing and the form of ownership.  Such impacts are considered in turn.

Using the simulation methodology described in the next section, we
computed the worse-case certainty impact of passive loss rules on rents.  That
is, the investment earns the expected return with certainty, and no passive
gains on other investments are available to offset passive losses.  The
analysis implies little impact.  The combination of lengthened tax depreciation
and construction period interest and property tax (CPIT) deductions (to 27.5
years), lower interest rates (one percentage point), and higher rents (10
percent) virtually eliminates initial tax losses.  Moreover, if passive losses
were expected to be greater, as they would be in a higher inflation (and thus
interest rate) environment, the financing could/would be restructured.  The
simplest method would be greater use of equity.  Alternatively, debt with
equity-kickers (share of asset appreciation or increase in rents) could be used
to lower direct interest costs and thus passive losses.

The passive loss rules could still affect market rents, however.  While
no losses occur when the project "works," significant uncertainty surrounds the
net operating income from properties, and losses would occur if this income

-13-

falls significantly below expectations.  If incomes from other projects are not sufficient to offset the passive losses, net losses would not be currently deductible.  This possibility would cause investors to raise the required expected return on real estate investments.  Also acting to raise the required return is the reduction in importance of the relatively certain tax depreciation component of real estate investment vis-a-vis the relatively uncertain operating income and cash reversion component.

The passive loss rules will likely increase the number of real estate transactions.  At any point in time, some projects are likely to be souring -- earning significant passive losses and promising to do so for some future periods -- and others to be sweetening -- earning above expected returns and thus promising significant passive gains in the future.  A sale of the sour project to the owner of the sweet one would allow the banked passive losses to be immediately deducted and would transfer the expected future losses to an owner who could use them as they accrue.  While the sale price will be a distressed one, the buyer and seller will gain vis-a-vis the Treasury in that the losses will be deducted sooner.

A final issue is the impact on ownership form.  Will large C corporations increase their ownership of real estate because they are able to deduct passive losses against nonpassive income but individuals and partnerships are not?

-14-

This seems likely in the short run when substantial passive losses on numerous projects exist, owing to both the large losses built into deals in the last few years and the high vacancy rates for many types of real estate in many areas of the country.  In the longer run, however, expanded corporate ownership seems unlikely.  For the first time in decades, the corporate income tax rate will be higher than the maximum personal tax rate.  Moreover, the taxation of corporate income at the personal level may even be rising with the increase in the capital gains tax rate.  The 1986 Tax Reform Act is unlikely to be a boon to the corporate ownership form.

### III.   Impacts on Income-Producing Properties

This section reports the likely effects of the Tax Act upon the rents and values for rental and commercial real estate.  The discussion makes the stylized distinction between the long- and short-run effects of the Act.  The short-run effect is to alter the values of existing properties, while the long-run effect is to alter the level of rents.  The likely impacts on rents and values are reported in turn, but first we discuss the precise tax law changes analyzed and the key underlying assumptions made.

The real estate provisions analyzed are:  the lengthening of tax depreciation from 19 years, 175% DB to 27.5 (or 31.5) years straight line, an extension of the deduction period for construction period interest and taxes from 10 to 27.5 (or 31.5) years, the removal of the capital gains exclusion and a cut in personal tax rates.  All of these changes tend to raise rents and lower real estate values.

The precise tax rate change depends on the assumed marginal investor.  For the new law, a marginal federal rate of 0.33, which would be paid on taxable income of $72,000 to $193,000 (itemizing married couple with two dependents), seems reasonable enough.  But the corresponding tax rates under

-15-

the old law (indexed to 1988) range from 0.42 ($68,000 to $97,000) to 0.49 ($124,000 to $184,000), with 0.45 lying in between.  Because of our uncertainty regarding the marginal investor, two sets of results will be reported, one starting with a 0.52 tax rate [0.49 + (1 - .49).06, where .06 is the presumed state and local income tax rate] and the other with a 0.45 rate [0.42 + (1 - .42).052].  In both cases, the marginal investor under new law is assumed to be in the 0.36 bracket [0.33 + (1 - .33).045, the lower state and local rate reflecting a presumed cut to offset the broadening of the taxbase].  That is, the marginal rate will be cut by 0.09 or 0.16.

The major assumptions underlying the analysis are an expected inflation rate of 0.045, a risk-free interest rate of 0.09 applied to debt maintained at two-thirds of the market value of the project (see Hendershott and Ling, 1986), depreciation rates of 2½ percent in rents and 3 percent in structure price,[6] and a required after-tax return on equity of about 0.105 for the 52 percent tax bracket investor and 0.115 for the 45 percent investor.[7]

### A.  Impact on Equilibrium Rent Levels

The computational procedures employed to determine the change in equilibrium rent use a discounted cash flow model of an investment in real estate.  The model takes into account the downpayment, the expected after-tax cash flows, and the expected net reversion at sale.  The long-run equilibrium level of rent is the initial rent that would equate the net present value of the investment to zero for a given set of assumptions (inflation, interest rate, required return on equity, etc.) and a particular tax regime.  This rent per dollar of investment serves as a hurdle rate for prospective investors in income-producing properties.  If a property can earn a rent greater than the equilibrium rent, then new units will be built to expand the supply of real estate.  This process continues until the market rent declines to the

-16-

equilibrium rent.  On the other hand, if the equilibrium rent were to jump above the market rent, then new construction would be cut back until market rent rose to the new equilibrium value.  The impact of the Tax Act upon rents is obtained by comparing the equilibrium level of rent under previous law to that required under the new law.  In this computation, real estate value is assumed to equal its presumably unchanged replacement cost.

The equilibrium level of rent must increase under the Act to replace the reduced tax benefits.  Only then will investors in real estate earn a rate of return comparable to what can be earned on other investments of similar risk. Estimates of the likely rent increase are presented in Table 2 for alternative of assumptions regarding the tax rate of the marginal investor in real estate and the size of the interest rate decline.  The first numbers, which are discussed first, are for residential properties;  the second numbers (in parentheses) are for commercial properties.

The top row indicates the equilibrium increase in rent assuming no change in interest rates for two different assumptions regarding the tax rate of the marginal investor under pre1986 law.  With a 45 percent marginal tax rate, rents will increase by 19 percent; with a 52 percent marginal rate, the rent increase is 33 percent.  These increases are partially a result of increases in the required rate of return (81 and 182 basis points, respectively, for the 45 and 52 percent tax-bracket investors) owing to the generally lighter taxation of pretax returns on alternative investments.  Because ample evidence exists that taxpayers with tax rates far below the maximum are active in the rental market, the 19 percent increase seems more plausible than the 33 percent increase.

-17-

In the second row a 100 basis point decline in interest rates (and a 68 basis point decline -- relative to that incorporated in the first row -- in the required <u>after-tax</u> equity rate) is factored into the analysis. The result is a substantial reduction in the required rent increase: from 19 percent to 11 percent for the 45 percent tax-rate investor and from 33 percent to 24 percent for the 52 percent investor. The rational for believing that the Tax Act would lower interest rates was developed earlier.

The required return on equity in real estate could rise relative to that on other investments because the importance of the relatively certain tax depreciation component of the return to real estate will decline vis-a-vis the less certain net-operating-income component. Moreover, real-estate losses will no longer be deductible against nonpassive income. If one's passive activities should fall on hard times, the lack of deductibility against other income would result in the investor shouldering the entire loss, as opposed to sharing it with the U.S. Treasury. A one percent increase in the required return would raise all equilibrium rent increases in Table 2 by about four percentage points.

Our own view is that a 10 to 15 percent rent increase for residential properties is most likely. That is, we believe (1) the marginal investor under the old law to have been in the 45 percent tax bracket, (2) the likely decline in interest rates to be 100 basis points, and (3) some increase in the required return to be necessary to offset the increased riskiness of real estate investments.

The rent increases for commercial properties -- the numbers in parenthesis in Table 2 -- are lower. For the 45 percent tax rate, the percentage increases are about 5 points less; for the 52 percent tax rate, the increases are 7 points less. While tax depreciation for commercial properties is less generous than for residential under the new law, depreciation for the

-18-

former was even less generous than for the latter under the old law. For
commercial properties, then, the expected range of "rent" increases is 5 to 10
percent.

It is important to reiterate the process by which rents increase in
competitive markets. Builders will find it less profitable to invest at the
current level of rents with the new tax incentives than with the old. The
combination of reduced new construction with normal growth in demand and steady
obsolescence of the existing stock will eventually generate higher rents for
the existing stock.

How quickly will rents rise from the old equilibrium level to the new?
The rise will occur at the most rapid rate in fast-growing markets and will get
to the new equilibrium sooner the smaller the change in the equilibrium level.
Of course, in markets with high vacancy rates this rent rise will occur only
after current rents and occupancy rates get back to their equilibrium level
under old law. Our best guess is that it will take four (Columbus, Ohio) to
ten (Houston, Texas) years for rents to rise to their new equilibrium level.

Which provisions of the Act are most responsible for the rent increases?
Estimates of the effects of the individual provisions, including a change in
the marginal tax rate from 0.45 to 0.36, were computed two ways: the change
in the equilibrium rent if a specific provision were the only change being made
and the change when this provision is added after all other provisions --
including a 100 basis point decline in the rate of interest -- had been taken
into account. Either way, the depreciation change increases rents about twice
as much as the cut in the regular income tax rate does, and the impacts of the
CPIT and capital gains exclusion are negligible. Removal of the capital gains
exclusion is of little importance because (1) few gains are expected in a low
inflation environment, (2) gains are expected to be realized in the far distant

future (see the next paragraph), and (3) the gains exclusion is also removed on alternative investments, a fact that will lower the required return on real estate and thus tend to offset the direct impact of the exclusion removal.

Trading should decrease under the new law. Under old law, trading before tax depreciation disappeared in the 19th year was advantageous. Trading should not be optimal prior to the new $27\frac{1}{2}$ (or $31\frac{1}{2}$) year tax depreciation life because a penalty to trading — the capital gains tax rate — has been increased and an advantage to trading -- getting on the new depreciation schedule -- has been decreased (see Hendershott and Ling, 1984, on optimal trading). Moreover, the value of installment sale transactions, a method of dampening the capital-gains tax penalty, is greatly reduced in the Tax Act for sales of assets worth over $150,000 for sellers with substantial debt. In effect, the fraction of taxes that could formerly be deferred is reduced by the ratio of the seller's debt to book value of assets.

### B. Impact on the Value of Existing Properties

We now turn to the short-run impact of the Act upon the value of existing real estate. The initial perspective taken is that of an investor in early 1987 contemplating purchase of property put in place in 1986. This new investor will face a less generous tax depreciation schedule, a higher capital gains tax rate, a lower marginal tax rate and, possibly, passive loss limitations. The question, then, is how much will this new investor alter his bid for the property relative to his bid under previous law? The standard of comparison is the price of the property that would have made it a zero net present value investment under the old law, assuming that rents were at their equilibrium level.

If rent instantaneously jumped to its new equilibrium level, then value would not decline; the higher rent would compensate exactly for the less generous tax depreciation, lower marginal tax rates, etc. Because rent will

-20-

not rise instantaneously, value will decline, the magnitude depending on how slowly investors think rent will rise to the new equilibrium level (Hendershott and Ling, 1985). The longer is the expected adjustment -- the greater is the present value of expected below equilibrium rents -- the greater will be the fall in value. A useful analogy can be drawn to the pricing of discount bonds. Bonds sell at a discount when they are earning a below-market coupon (rent). The more the coupon is below market and the longer the bonds are expected to earn the below-market coupon (the longer is the bond's maturity), the lower is the market value relative to par.

Investor expectations of the rental adjustment process should vary with both the growth rate of the area and the extent of initial disequilibrium. We consider two growth rates (zero and positive) and three prereform states of the market (equilibrium, 10 percent "excess capacity" and 20 percent excess capacity). In all cases, depreciation or obsolescence is assumed to occur at the rate of 2 percent per year. Thus 10 percent excess capacity or below market rent would be eliminated in 5 years even with zero growth. The positive growth market is assumed to eliminate 5 percent excess capacity per year, 2 for obsolescence and 3 for growth. Thus 30 percent initially below-market rents, 20 percent due to excess capacity and 10 percent due to tax reform, would be eliminated in 6 years in the high growth area versus 15 years in the no-growth area.

The upper half of Table 3 contains estimates of the percentage value declines in a property purchased in early 1987 owing to an 11 percent increase in equilibrium rents and the failure of actual rents to increase immediately to that level. The first row is for a property that would have had a zero net present value under the old law, i.e., is in a market in equilibrium prior to the enactment of the Tax Act. As can be seen, the value decline is a modest one percent in a growth market and two percent in a no-growth market.

-21-

Rows 2 and 3 pertain to cases of 10 and 20 percent excess capacity.  In these calculations, we first compute the total percentage price discount from reproduction cost and then attribute some of it to the initial disequilibrium and the remainder to tax reform.  The calculations are illustrated in Figure 2 which plots real rent over time.  The solid horizontal line is equilibrium real rent in the absence of tax reform;  the dashed horizontal line is equilibrium rent with tax reform.  Now consider a market initially in equilibrium.  As a result of tax reform at time 0 in the figure, rent rises along the BC segment, the slope of which is steeper in growth areas than in no-growth areas.  The decline in value is measured as the ratio of the present value of triangle ABC to the initial value (reproduction cost).  Next, consider a market with substantial excess capacity prior to enactment of the Tax Act, i.e., initial rent equal to D rather than B.  With passage of the Act, rent rises along the DF segment.  The percentage price discount from reproduction cost is the ratio of the present value of triangle ADF to reproduction cost.  The percentage decline in value due to the Tax Act is then the ratio of the difference in the present values of ADF and BDE -- the present value of ABEF -- to the initial below market price (reproduction cost less the present value of triangle BDE).

As can be seen in Table 3, the value declines are far larger when substantial excess capacity exists.  The Tax Act is seen to reduce value, from an already depressed level, by 7 or 8 percent in no-growth areas versus only 4 percent in a growth area.  The 8 percent is probably the upper bound on value decline.  The 11 percent rent increase and 20 percent excess capacity is a worse case commercial scenario and is probably equivalent to a worst case rental scenario.  While greater rent increases are possible for rental, excess capacity is far less.

-21a-

Figure 2
Rent Paths with and without the Tax Act



-22-

The perspective taken above was that of new buyer of the property in early 1987; an alternative perspective is that of the current owner of a new property placed in service in 1986. The value of the investment to this person will exceed that to the 1987 purchaser because this person will be able to use the more generous tax depreciation schedule from previous law and, if he purchased before 10/22/86, the passive loss transition rules. The computations are contained in the lower half of Table 3. Note that the value to this investor rises even if rents are expected to take 5 years to adjust (the no growth assumption), as long as the passive loss limits are not binding. That is, the present value of the tax saving from the more favorable tax depreciation exceeds the present value of the below-market rents. However, if the investor has no passive income to offset passive losses and is not eligible for the transition rules (row 5), the more generous depreciation is of no value. Because this investor is worse off than the marginal investor, who is not affected by the passive loss limits by assumption, value declines are greater than those in row 1. Finally, if this investor purchased the property before 10/22/86 (row 6), the value declines would be less than those of the marginal investor purchasing in 1987. That is, the transition rules would nearly allow the investor to maintain value.

A comparison of row 1 with rows 4-6 yields interesting implications regarding trading in 1987. Row 1 can be viewed as the maximum bid price, relative to reproduction cost, of an investor for a property in 1987 whereas rows 4-6 give the relative value to owners of the property in different tax situations. An owner will sell only if the bid price of a new investor exceeds the value of holding the property. These numbers suggest (1) a strong disincentive by owners not subject to the passive loss limits to trade properties purchased in 1986, (2) a mild disincentive for owners subject to the limits but eligible for the transition rules, and (3) a strong incentive to

-23-

trade by those subject to the limits and not eligible for the transition rules. In fact, the latter investor trades in the first or second period in our model to maximize his return (minimize his loss). A disincentive to trade also holds for investors not subject to the loss limits who purchased properties in earlier years, but the disincentive is less the earlier the property was purchased because the present value of the tax saving from the more generous depreciation under old law is less.

### IV.  Impact on Owner-Occupied Housing

Current law grants important benefits to homeowners:  imputed rental income is not taxed, and capital gains are rarely taxed and then only on a much deferred basis. Moreover, the deductibility of home mortgage interest ensures that itemizing households who debt finance will benefit fully from the nontaxation of owner-occupied housing. A consequence of these favorable provisions is that homeowners receive substantial tax subsidies.  The higher the marginal tax rate of an individual, the larger the subsidy and the lower is the after-tax cost of owner-occupied housing.

The Tax Act of 1986 does not directly alter any of these favorable provisions, but it does affect the after-tax cost of owner-occupied housing. First, the tax rates at which households deduct housing costs are reduced. Second, the pretax level of interest rates will be lower.  Furthermore, the combination of changes in owner costs and in market rents will likely change the aggregate homeownership rate.

The annual after-tax cost of obtaining one unit of housing capital depends upon the cost of debt, the cost of contributed equity, property taxes, real economic depreciation, expected appreciation, and the tax savings associated with owner-occupied housing.  Two costs or "prices" of owner housing are relevant:  the average cost, which influences the tenure choice decision;

-24-

and the marginal cost, which affects the quantity demanded by households that choose to own.  The average and marginal costs, respectively, are higher the lower are the average and marginal tax rates at which housing costs are deductible.

Estimates of owner housing costs for households in different income classes under both old law and the Tax Act are contained in Table 4, based on the tax rates listed in Table 1.[8]  If interest rates were not affected by the Tax Act, then the marginal cost would be unchanged for households with incomes under $30,000 but would rise by roughly 10 percent for those with higher incomes because of the general decrease in the tax rates at which marginal housing costs are deducted.  If, however, interest rates decline by 100 basis points, as we expect, then households with incomes below about $30,000 will experience about a ten percent decrease in marginal housing costs, households with incomes above about $130,000 will face a 5 percent increase, and the change for other households will be negligible.  Thus any tendency toward softer house prices will be confined to only the very high end of the market (over $250,000) and will be modest in magnitude.

In the absence of a decline in interest rates, average housing costs increase 5 to 10 percent across the board.  Costs increase for households with incomes below $30,000, in spite of roughly no change in marginal tax rates, because the Tax Act both raises the standard deduction and reduces nonhousing-related itemized deductions (sales taxes, consumer interest, etc.), causing more housing deductions of these households to be wasted than was the case under the old law.  With the 100 basis point decline in interest rates, however, average housing costs will decrease slightly for households with incomes below approximately $60,000; households with incomes above about $120,000 will experience a 5 percent increase in costs.

-25-

Homeownership depends on, among other things, the ratio of the average cost of owning to the cost of renting. The percentage changes in these ratios for households in the various income classes are reported in Table 5. The calculations in column 1 assume no decline in interest rates and no change in rents. Columns 2 and 3 factor in the 100 basis point decline in interest rates, first without, then with, a 10 percent increase in rental costs. Because rents are held constant in columns 1 and 2, the percentage changes equal the percentage changes in average owner costs for each income level. With the interest rate decline and no rent increase, the ownership rate will likely increase modestly for households with incomes below about $60,000 and decrease ever so slightly for higher income households. With the rise in rents, all currently renting households will find homeownership relatively more attractive than under old law. Overall, the aggregate homeownership rate would eventually rise by about 3 percentage points.

### V. Low-Income Rental Housing

Tax incentives to stimulate the construction of low-income rental housing have been part of the law for many years. Previous law allowed investors in low-income properties to depreciate the properties over 15 years and to use a 200 percent declining balance method; in addition, CPIT would be expensed during the construction period. Furthermore, investors often had access to tax-exempt financing at rates substantially below market.

The Tax Act changes this law in two important respects. First, the preferential depreciation and construction period write-off schedules are replaced with a system of tax credits that depends upon the type of housing purchased or built and whether the project has access to tax-exempt financing or other types of subsidy. Specifically, the investor receives:

-26-

1) An annual credit for 10 years which has a present value equal to 70 percent of the cost of construction (both new and substantially rehabilitated projects) placed in service between 1/1/87 and 12/31/89. For 1987, the applicable Treasury discount rate converts into a 9 percent annual credit, but this credit will rise if interest rates rise and fall if rates decline.

2) For existing low-income housing or new construction with tax-exempt financing or other rental housing subsidies (e.g., FmHA section 515 loans), the present value of the credit is 30 percent (the annual credit for 1987 is 4 percent).

The depreciable basis is not reduced by the credit. Second, the availability of tax-exempt financing is reduced.

An analogy to the passive loss limits applies to these credits, as does a "small landlord provision." The latter says that up to $7,000 in credits (0.28 times $25,000) can be used to offset taxes on regular or portfolio income by households with taxable income below $200,000 (no active management criterion need be met). The offset is phased out between $200,000 and $250,000. With a nine percent annual credit, an investment of up to $77,778 ($7,000/.09) is eligible for the full offset.

Potentially severe restrictions are placed upon investments to qualify investors for the credits. First, at least 20 (40) percent of the units must be occupied by tenants whose income cannot exceed 50 (60) percent of the area's median income adjusted for family size, and only the units so occupied receive the credit. (Previous law defined qualifying income as 80 percent of the area's median income.) Second, tenants cannot pay more than 30 percent of their income in rent. Third, the project must satisfy these

-27-

15 years after it is placed in service or purchased, otherwise a substantial penalty will be levied. Fourth, the total value of the credits issued in a state is limited to $1.25 times of the population of the state.

A number of difficult conceptual problems exist in modeling low-income housing. These include specifying the expected sales prices at year 15 and beyond and the depreciation rates and required equity returns, both which are presumably higher than their counterparts for regular rental housing. These and other problems must be addressed before a definitive statement can be made on the treatment of low-income housing in the Tax Act vis-a-vis old law. Nonetheless, we have made a few "minimum" rent calculations that are probably instructive.

The minimum rent required by investors to earn their required rate of return is half as large with the new 9 percent credit as it was under old law, even when tax-exempt financing was employed (the debt rate was 200 basis points below market). With the 4 percent credit and tax-exempt financing, the minimum rent is roughly the same as under old law with tax exempt financing. This suggests two things. First, the 9 percent credit dominates the 4 percent credit with tax-exempt financing. Thus, limits on tax-exempt financing for low-income housing may not be of importance. Second, the 9 percent credit is far more generous than old law. Whether the credit is sufficient to generate a substantial increase in the construction of low-income housing is unknown, however.

### VI.  Summary

In contrast to the conventional wisdom, real estate activity in the aggregate is not disfavored by the 1986 Tax Act.  Within the broad real estate aggregate, however, widely different impacts are to be expected.  Regular rental and commercial activity will be slightly disfavored (modest increases in rents and declines in values will occur), and historic and old rehabilitation activity will be greatly disfavored.  In contrast, owner-occupied housing, far and away the largest component of real estate, is favored, both directly by an interest rate decline and indirectly owing to the increase in rents. Homeownership should rise significantly, and the quantity and value of houses should increase slightly, except at the very high end of the market.  Low-income rental housing may be the most favored of all activities.

The rent increase for residential properties will be 10 to 15 percent with our assumption of a percentage point decline in interest rates.  For commercial properties, the expected rent increase is 5 to 10 percent.  The market value decline, which will be greater the longer and further investors think rents will be below the new equilibrium, is unlikely to exceed 4 percent in fast growth markets, even if substantial excess capacity currently exists. Moreover, the value of recently-purchased properties to their current holders not subject to the passive loss limits will generally rise because the more generous tax depreciation allowances under old law vis-a-vis new law adds more value than the expected below-market rent subtracts.  In no-growth markets with substantial excess capacity, market values could decline by as much as 8 percent from already depressed levels.

Two offsetting factors operate on the after-tax cost of owner-occupied housing.  Lower tax rates increase the cost, but lower interest rates decrease it.  With a percentage-point interest-rate decline, the after-tax marginal cost will fall by about 10 percent for most households with incomes below $30,000

-29-

and rise by about 5 percent for those with incomes above $130,000.  Thus, only
the highest price houses would experience weakness in value.  Average housing
costs will decrease slightly in this scenario for households with incomes below
about $60,000, but increase by 5 percent for those with incomes above twice
this level.  With the projected increase in rents, homeownership should rise
for all income classes, but especially for those with income under $60,000.
The aggregate home ownership rate is projected to increase by three percentage
points in the long run in response to the Tax Act.

The new passive loss limitations are likely to lower significantly the
values of loss-motivated partnership deals and of properties in areas where the
economics have turned sour (vacancy rates have risen sharply).  The limitations
should have little impact on new construction and market rents, however.
Reduced depreciation write-offs, lower interest rates, and higher rents all act
to lower expected passive losses.  Moreover, financing can be restructured to
include equity-kickers or less debt generally at little loss of value.

-30-

## Footnotes

[1] This is not the first tax act whose impact on real estate would be misunderstood without allowing for interest rate changes. Many (Brueggeman, et. al., 1981, for example) predicted substantial rent decreases in response to the more generous tax depreciation allowances contained in the Economic Recovery Tax Act of 1981. Hendershott and Shilling (1982), however, foresaw a sharp increase in interest rates as a result of the Act and forecast rising real rents. Real rents have, in fact, risen by 10 percent since 1980.

[2] The households for which calculations are reported are also assumed to have one wage earner and the average fringe benefits and nonhousing itemized deductions of their income classes (based on 1983 SOI data), to own houses of dollar value equal to twice their AGIs and to pay property taxes equal to 1.2 percent of their house values. The general methodology for computing these tax rates is discussed in Hendershott and Slemrod (1983).

[3] These credits are subject to the same passive loss treatment as is the credit for low-income rental housing (see Section IV below).

[4] See Graetz and Sunley (1986) for a detailed discussion of both the individual and corporate minimum taxes.

[5] The ratio of tax depreciation on a dollar of depreciable investment when the minimum tax is fully applied to tax depreciation with no minimum tax is

$$[\tau(1/27.5)-\tau_{min}(1/27.5 - 1/40)]/\tau(1/27.5),$$

where $\tau$ is the regular tax rate and $\tau_{min}$ is the minimum rate. With $\tau = 0.52$ and $\tau_{min} = 0.257$ (0.21 plus the state and local tax), this ratio is 0.846.

-31-

[6] A potential problem with discounted cash flow models of this type is consistency between the assumed patterns of future rents and prices (Ling and Whinihan, 1985). Assuming that rents are initially at the equilibrium level, the $2\frac{1}{2}$ and 3 percent assumed depreciation rates provide consistency, e.g., the resale price at year 20 is within one percent of the present value of cash flows beyond year 20. This consistency holds for both old law and the Tax Act.

[7] We compute the required equity rate (e) as:

$$e = (1 - t^*)[i + \frac{beta}{1-v}(rm - i)],$$

where $t^*$ is a weighted average of the taxpayer's income and effective capital gains tax rates, i is the interest rate, beta is the measure of the covariance of an unlevered real estate investment with the market return (assumed to be 0.5), v is the loan-to-value ratio, and rm − i is the excess of the return on the market portfolio over the (risk free) interest rate (assumed to be 0.06). The weights attached to the regular and effective capital gains tax rates, respectively, are 3/4 and 1/4. The capital gains tax rate is $(1-excl.)\tau/2$, where excl. is the long-term capital gains exclusion, $\tau$ is the regular income tax rate and the division by 2 reflects deferral. For pre1987 law, $\tau^* = .8\tau$; for the new law, $\tau^* = .875\tau$.

[8] For details on the precise methodology underlying these calculations, see Hendershott and Ling (1986).

-32-

## References

Brueggeman, William B., Jeffrey D. Fisher and Jerrold J. Stern, "Rental Housing and the Economic Recovery Tax Act of 1981," Public Finance Quarterly, 10, April 1982, pp. 222-241.

Galper, Harvey, Robert Lucke and Eric Toder, "The Economic Effects of the Tax Reform Act of 1986: Simulations with a General Equilibrium Model," Brookings Tax Conference, October 30-31, 1986.

Graetz, Michael J. and Emil Sunley, "Minimum Taxes and Comprehensive Tax Reform," Brookings Tax Conference, October 30-31, 1986.

Hendershott, Patric H., "Tax Changes and Capital Allocation in the 1980s," in Feldstein (ed.), The Effects of Taxation on Capital Formation, University of Chicago Press, 1987.

Hendershott, Patric H. and David C. Ling, 1984, "Trading and the Tax Shelter Value of Depreciable Real Estate," National Tax Journal, June 1984, pp. 213-223.

Hendershott, Patric H. and David C. Ling, 1985, "Prospective Changes in Tax Law and the Value of Depreciable Real Estate," Journal of the American Real Estate and Urban Economics Association, Fall 1984, pp. 297-317.

Hendershott, Patric H. and David C. Ling, 1986, "Likely Impacts of the Administration Proposal and the House Bill," in Follain (ed.), Tax Reform and Real Estate, The Urban Institute, 1986, pp. 87-112.

-33-

Hendershott, Patric H. and James Shilling, "The Impacts on Capital Allocation of Some Aspects of the Economic Recovery Tax Act of 1981," Public Finance Quarterly, April 1982, pp. 242-273.

Hendershott, Patric H. and Joel Slemrod," "Taxes and the User Cost of Capital for Owner-Occupied Housing," Journal of the American Real Estate and Urban Economics Association, Winter 1983, pp. 375-393.

Ling, David C. and Michael Whinihan, "Valuing Depreciable Real Estate:  A New Methodology," Journal of the American Real Estate and Urban Economics Association, Summer 1985, pp. 181-194.

-34-

Table 1

Tax Rate at Which Housing Costs Are Deductible

| Income (000) | Tenure Choice (Average) | | Quantity Demanded (Marginal) | |
|---|---|---|---|---|
| | Old Law | Tax Reform | Old Law | Tax Reform |
| 13-25 | .146 | .074 | .166 | .176 |
| 25-30 | .211 | .128 | .189 | .180 |
| 30-50 | .279 | .242 | .251 | .184 |
| 50-100 | .402 | .316 | .364 | .316 |
| 100-200 | .471 | .370 | .455 | .370 |

Authors calculations (see footnote 2).

-35-

Table 2

Percentage Change in the Equilibrium Rent Level
(commercial number in parentheses)

| | Change in Tax Rate of Marginal Investor | |
| --- | --- | --- |
| | .45 to .36 | .52 to .36 |
| Basic Provisions and No Decline in the Interest Rate. | 19 (14) | 33 (18) |
| Basic Provisions and a 100 Basis Point Decline in the Interest Rate. | 11 (6) | 24 (10) |

Authors calculations (see text).

-36-

Table 3

Estimates of Likely Percentage Property Value Changes
(11 Percent Rise in Equilibrium Rents)

| | Fast Growth | | No Growth | |
|---|---|---|---|---|
| | Total Price Discount | Discount Due to Reform | Total Price Discount | Discount Due to Reform |
| **Purchased 1/1/87** | | | | |
| 1. In Equilibrium | -1 | -1 | -2 | -2 |
| 2. 10% Excess Capacity | -5 | -4 | -9 | -7 |
| 3. 20% Excess Capacity | -9 | -4 | -16 | -8 |
| **Held by Investor After Purchase on** | | | | |
| 4. 12/1/86, no passive loss limits | | 5.3 | | 5.2 |
| 5. 12/1/86, passive loss limits fully binding | | -2.2 | | -2.6 |
| 6. 10/1/86, passive loss limits fully binding but transition rules are applicable | | -0.5 | | -1.4 |

Authors calculations (see text).

-37-

## Table 4

### Marginal and Average After-Tax Cost of
### Owner-Occupied Housing by Income Class

| Income (000) | Old Law | | Tax Act of 1986 | | | |
| | | | 9% Interest Rate | | 8% Interest Rate | |
| | Marg. | Ave. | Marg. | Ave. | Marg. | Ave. |
|---|---|---|---|---|---|---|
| 13–25 | .0818 | .0851 | .0808 | .0909 | .0729 | .0820 |
| 25–30 | .0795 | .0777 | .0804 | .0865 | .0726 | .0772 |
| 30–50 | .0734 | .0700 | .0800 | .0743 | .0722 | .0673 |
| 50–100 | .0633 | .0610 | .0670 | .0670 | .0624 | .0624 |
| 100–200 | .0567 | .0550 | .0629 | .0629 | .0588 | .0588 |

Authors calculations (see footnote 2).

-38-

Table 5

Impact of the Tax Act on the Ratio
of Average Owner Costs to Rental Costs

| Income (000) | 9% Rate, No Change in Rents | Percentage Change in Ratio | |
|---|---|---|---|
| | | 8% Rate No Change in Rents | 8% Rate, 10% Increase in Rents |
| 13–25 | 7 | −4 | −12 |
| 25–30 | 10 | −1 | −10 |
| 30–50 | 6 | −4 | −13 |
| 50–100 | 10 | 2 | −7 |
| 100–200 | 14 | 7 | −2 |

Authors calculations (see text).

# EXHIBIT "E"



# MERS® System Procedures Manual

**Release 23.1**

Effective Date: July 16, 2023

© 2023 MERSCORP Holdings, Inc. All rights reserved.

MERS®

# Contents

Introduction ..................................................................................................................... 1
   Conventions in Use in This Document ......................................................................... 1
   MERS® System Overview ............................................................................................. 1
      Types of Loans Registered on MERS® System ......................................................... 1
      MERS Loans ............................................................................................................ 2
      Registering Loans before Closing ............................................................................ 2
      MIN Record Overview .............................................................................................. 2
      Other MERS® System Services ................................................................................ 3
   Supporting Documentation .......................................................................................... 3
MERS® System Membership .......................................................................................... 4
   Requirements: MERS® System Membership ................................................................ 4
      Loans Closed by a Lite Member .............................................................................. 4
         Requirements: Loans Closed by a Lite Member .................................................. 4
      Loans Closed by a Lite-R Member .......................................................................... 5
         Requirements: Loans Closed by a Lite-R Member .............................................. 5
   Procedure: Member Integration .................................................................................. 5
   Membership Changes .................................................................................................. 5
      Requirements: Membership Changes ...................................................................... 6
      Procedure: Membership Changes ........................................................................... 6
   Member Information ..................................................................................................... 6
      Requirements: Maintaining Member Information ...................................................... 7
      Procedure: Maintaining Member Information ........................................................... 7
      Information Maintained by MERSCORP ................................................................... 8
   Member Resignation .................................................................................................... 8
      Requirements: Member Resignation ....................................................................... 8
      Procedure: Member Resignation ............................................................................. 9
      Certificates of Ownership ........................................................................................ 9
         Procedure: Certificates of Ownership ............................................................... 10
         System Actions: Certificates of Ownership ....................................................... 10
MERS® System Security ............................................................................................... 10
   MERS® System User IDs ............................................................................................ 11
   Requirements: System Security ................................................................................ 11
   Third-Party Vendors .................................................................................................. 12
   Associated Members ................................................................................................. 12
   XML and Batch Inquiry Transactions ......................................................................... 12
      XML Inquiry ........................................................................................................... 12
      Batch Inquiry ......................................................................................................... 13
Mortgage Identification Number ("MIN") ...................................................................... 13
   Procedure: Creating a MIN ....................................................................................... 13
Loan Registration ......................................................................................................... 14
   Requirements: Loan Registration .............................................................................. 14
      Requirements: All Loan Registrations ................................................................... 14
      Requirements: MOM Loan Registrations ............................................................... 15

# MERS˙

*Requirements: Non-MOM Loan Registrations* ................................................................. 15
Requirements: MERS® System Data Integrity ................................................................. 15
Procedures: Loan Registration .......................................................................................... 17
  *Procedure: MERS Loan Registration* ............................................................................ 18
  *Procedure: Completing a Pre-Closing Registration* ...................................................... 18
  *Procedure: Re-registration after Reversal* ................................................................... 18
  *Procedure: Re-registration after Deactivation* .............................................................. 19
System Actions: Loan Registration ................................................................................... 19
Registration Reversal ....................................................................................................... 20
  *Requirements: Registration Reversal* ........................................................................... 21
  *Procedure: Registration Reversal* ................................................................................. 21
  *System Actions: Registration Reversal* ......................................................................... 22
**MERS® RON Video Storage** ......................................................................................... **22**
RON Closing Provider LOB ............................................................................................... 23
Requirements: MERS® RON Video Storage ..................................................................... 23
  *Video Upload Requirements* .......................................................................................... 23
  *File Name, Notary Name, and Commission Number Requirements* .............................. 24
Procedure: Upload RON eClosing Video ........................................................................... 25
System Actions: Upload RON eClosing Video ................................................................... 25
  ***Previously Registered Loan*** ................................................................................... 25
  ***Unregistered Loan*** ................................................................................................. 25
Procedure: Download RON eClosing Video ....................................................................... 26
System Actions: Download RON eClosing Video .............................................................. 26
Procedure: View RON Video Event Log ............................................................................ 26
**Interim Funding Interests** ............................................................................................ **27**
Requirements: Removing Interim Funding Interests .......................................................... 27
Procedure: Removing an Interim Funding Org ID .............................................................. 27
System Actions: Removing an Interim Funding Org ID ...................................................... 28
**Transfers** ........................................................................................................................ **28**
Transfer of Beneficial Rights ............................................................................................ 29
  *Requirements: TOB Transactions* ................................................................................. 29
  *TOB Option 1 Transfer* .................................................................................................. 29
    Procedure: TOB Option 1 Transfer ............................................................................... 30
    System Actions: TOB Option 1 Transfer ....................................................................... 30
  *TOB Option 2 Transfer* .................................................................................................. 31
    Procedure: TOB Option 2 Transfer ............................................................................... 31
    System Actions: TOB Option 2 Transfer ....................................................................... 32
Transfer of Servicing Rights ............................................................................................. 33
  *Requirements: TOS Transactions* ................................................................................. 34
  *Procedure: TOS Transaction* ........................................................................................ 35
  *System Actions: TOS Transaction* ................................................................................ 36
TOS/TOB Combination ..................................................................................................... 38
  *Requirements: TOS/TOB Combo Transactions* ............................................................ 38
  *Procedure: TOS/TOB Combo Transaction* ................................................................... 38
  *System Actions: TOS/TOB Combo* ............................................................................... 39
Member-to-Member Petitions ........................................................................................... 40

# MERS

*Requirements: Member-to-Member Petition* ..................................................................................... 40
*Procedure: Member-to-Member Petition* ......................................................................................... 41
Member Notice of Default ("NOD") Dispute ......................................................................................... 41
*Procedure: Member NOD Dispute* .................................................................................................. 41
**MIN Record Deactivation** ................................................................................................................. 41
Paid in Full Deactivation ..................................................................................................................... 42
*Requirements: Paid in Full Deactivation* ....................................................................................... 42
*Procedure: Paid in Full Deactivation* ............................................................................................. 43
*System Actions: Paid in Full Deactivation* ..................................................................................... 43
Transfer to Non-MERS Status Deactivation ....................................................................................... 43
*Requirements: Transfer to Non-MERS Status Deactivation* .......................................................... 43
*Procedure: Transfer to Non-MERS Status Deactivation* ............................................................... 44
*System Actions: Transfer to Non-MERS Status Deactivation* ....................................................... 44
Deactivate-Assigned from MERS for Default or Bankruptcy Deactivation ........................................... 44
*Requirements: Deactivate-Assigned from MERS for Default or Bankruptcy Deactivation* .............. 44
*Procedure: Deactivate-Assigned from MERS for Default or Bankruptcy Deactivation* .................... 45
*System Actions: Deactivate-Assigned from MERS for Default or Bankruptcy Deactivation* ............ 45
Foreclosure Complete Deactivation (Initiated Before 7/22/11) ............................................................ 46
*Requirements: Foreclosure Complete Deactivation* ....................................................................... 46
*Procedure: Foreclosure Complete Deactivation* ............................................................................ 46
*System Actions: Foreclosure Complete Deactivation* .................................................................... 46
Deactivation Reversals ....................................................................................................................... 47
*Requirements: Deactivation Reversals* .......................................................................................... 47
*Procedure: Deactivation Reversals* ............................................................................................... 47
*System Actions: Deactivation Reversals* ....................................................................................... 47
**Modification Agreements** ................................................................................................................. 47
Requirements: Modification Agreements ............................................................................................. 48
Procedure: Modification Agreements .................................................................................................. 48
System Actions: Modification Agreements ........................................................................................... 48
**Construction and CEMA Loans** ....................................................................................................... 48
Requirements: Construction and CEMA Loans ................................................................................... 48
Procedures: Construction Loans ......................................................................................................... 49
*Procedure: Construction Loan Modified to Become Permanent* ..................................................... 49
*Procedure: Construction Loan Paid off by Permanent Loan* .......................................................... 49
Procedure: CEMA Loan Registration .................................................................................................. 49
System Actions: Construction and CEMA Loans ................................................................................. 50
**Assumption of Mortgage** ................................................................................................................. 50
Requirements: Assumption of Mortgage ............................................................................................. 50
Procedure: Assumption of Mortgage ................................................................................................... 50
System Actions: Assumption of Mortgage ........................................................................................... 51
**Property Preservation** ...................................................................................................................... 51
Procedure: Property Preservation Member Updates ........................................................................... 51
Procedure: Property Preservation MIN Updates .................................................................................. 51
System Actions: Property Preservation ................................................................................................ 52
**MERS® System Quality Assurance Program** .................................................................................. 52

# MERS®

Requirements: MERS® System QA Program ................................................................52
MERS® System QA Plan ..................................................................................................53
    *Requirements: MERS® System QA Plan* ..........................................................53
    *Procedure: MERS® System QA Plan Submission* ..........................................53
Annual Report ..................................................................................................................53
    *Requirements: Annual Report* ..........................................................................53
    *Procedure: MERS® System Annual Report Submission* ..............................54
Data Reconciliation .........................................................................................................54
    *Requirements: Data Reconciliation* ................................................................54
    *Member Reconciliation Extract (MRE)* ...........................................................55
        MERS Loan Data Reconciliation Requirements ......................................55
        Conditionally-Required Field Criteria ......................................................56
Quality Assurance Reviews ...........................................................................................57
    *Requirements: Quality Assurance Reviews* ...................................................57
**MERSCORP Mail Services** ..........................................................................................**58**
Requirements: Service of Process and Other Mail ....................................................58
Procedure: Unidentified Mail ........................................................................................59
**Corporate Resolution Management System** ............................................................**59**
Requirements: CRMS .....................................................................................................60
Procedure: Requesting a Corporate Resolution Appointing Signing Officers ......61
Procedure: Signing Officer Certification ......................................................................62
Procedure: Rule 3 Exception .........................................................................................63
Procedure: Requesting a Signing Authority Agreement ("SAA") .............................63
Procedure: Terminating a Signing Authority Agreement ("SAA") ............................64
Procedure: Deactivating the Member's CRMS Account .............................................64
Procedure: Quarterly Attestation ..................................................................................64
System Actions: CRMS Statuses for Org IDs and SAA Relationships .....................65
System Actions: Changes in Status of MERS® System Membership .......................66
System Actions: Auto-Submission of Request for a Corporate Resolution .............66
**MERS Documents** .........................................................................................................**67**
Requirements ...................................................................................................................67
    *General Requirements* ......................................................................................67
    *Document-Specific Requirements* ..................................................................70
    *State-Specific Requirements* ...........................................................................72
**Borrower Disputes** .......................................................................................................**73**
Requirements: Borrower Disputes ................................................................................73
Procedure: Borrower Disputes ......................................................................................73
**Disciplinary Actions** .....................................................................................................**73**
Lockout Status .................................................................................................................74
**MERSCORP Help Desk** ................................................................................................**74**
Contacting Help Desk .....................................................................................................74
Receiving Email Communications from MERSCORP ..................................................75
MERSCORP and MERS Email Messages .....................................................................75
**Reporting** ......................................................................................................................**76**
Requirements: MERS® System Reports .......................................................................77

MERS

Procedure: Retrieving Reports ................................................................................................77
**Involuntary TOS to a MERS® System Member**.................................................................**77**
Procedure: Involuntary TOS (Option 2 Investor) ...................................................................78
Procedure: Involuntary TOS (Option 1 Investor) ...................................................................78
System Actions: Involuntary TOS Transaction ......................................................................78
**Glossary**................................................................................................................................**79**
**Appendix A: MERS Signing Officer Primer** ....................................................................**93**
**Appendix B: Tracking iRegistration Loans** ...................................................................**106**
Requirements: iRegistration Loans .....................................................................................106
Procedures: iRegistration Loans .........................................................................................106
*Procedure: iRegistration Loan Registration*........................................................................ *107*
*Procedure: iRegistration to Non-MOM Conversion*.............................................................. *107*
*Procedure: iRegistration for REO Property* .......................................................................... *108*
*Procedure: Completing a Pre-Closing iRegistration*............................................................. *108*
*Procedure: iRegistration after Reversal* .............................................................................. *109*
*Procedure: iRegistration after Deactivation* ........................................................................ *109*
iRegistration Transfer Transactions.....................................................................................109
iRegistration Loan Deactivation...........................................................................................109
*Tracking iRegistration Foreclosure Activity* ........................................................................ *109*
iRegistration Data Reconciliation Requirements ..................................................................110

 MERS˙

## Requirements: Maintaining Member Information

- At least monthly, a Member is required to review and reconcile the information in its Member Profile to ensure that it is accurate and current, including the following contacts:
  - o Customer Service - Primary
  - o Executive Sponsor
  - o Legal
  - o Operational - Primary
  - o Quality Assurance Officer
  - o System Administrator - Primary
  - o Technical
  - o MERS® RON Video Storage
- A Member's MERS® System contacts must be employees of the Member organization.
- If the email address used for a MERS® System contact is a distribution list on a Member 's email server, the Member is responsible for ensuring the distribution list remains accurate and up-to-date.
- If a distribution list or mailbox is used as the email address for one of the MERS® System contacts, the other fields for that contact must identify an individual in the Member organization.
- The email addresses a Member provides for its MERS® System contacts must be valid email addresses that are issued by the Member on its corporate email system for the purpose of business correspondence. Public email domains are not permitted.
- A Member is required to keep its Accounts Billing Contact accurate and current.
- A Member must report changes to its Accounts Billing Contact information and document handling preferences using the MERS® Change Request Form.
- If a Member uses the My MERS® feature, it must maintain its customized Org ID lists.
- If a Member uses the Transaction Default Settings feature, it must maintain the information it has provided.

If MERSCORP is unable to reach a Member after repeated attempts, it may issue a final no-contact notice to the Member's Executive Sponsor. If the Member fails to respond to the final notice, MERSCORP may interpret the failure to respond as the Member's intent to resign and then begin the Resignation of the uncommunicative Member's membership on its behalf. See Member Resignation for details.

## Procedure: Maintaining Member Information

A Member maintains the following information in its Member Profile:

| Member Profile Component | Instructional Guidance |
|---|---|
| Member Corporate Address and Contact Information | Member Information - Name & Address Quick Reference Guide ("QRG") |
| MERS® System Contacts | Member Information - Contacts QRG |
| Member Options | A Member may update certain fields in its Member Options (see Member Information - Options QRG). MERSCORP updates the other fields (see Information Maintained by MERSCORP). |
| Relationships (with third-party organizations) | • Member Information - Relationships QRG<br>• My MERS® QRG<br>• eRegistry Relationships QRG |

 **MERS°**

| Member Profile Component | Instructional Guidance |
|---|---|
| | • Vendor Relationships QRG |
| Reports | • Reports - QRG |
| Transaction Default Settings | • Transaction Default Settings - QRG |

# Information Maintained by MERSCORP

MERSCORP maintains the information in the Member Profile listed in the table below. A Member can view this information at any time, but cannot update it. To request a change to this information, a Member must complete and submit the MERS® Change Request Form.

| Member Profile Component | Field |
|---|---|
| Name | • Org ID<br>• Company Name (see Membership Changes for details)<br>• Overnight Mail Special Instructions |
| General | All fields on page |
| Lines of Business | All fields on page |
| Options | • Document Handling Instructions (All)<br>• Days in pending foreclosure<br>• Bill Client<br>• Investor Options (All)<br>• Servicer Options (All, including Agency ID)<br>• Subservicer Options (All)<br>• Registration By Others (All)<br>Contact the Help Desk to update Document Handling Instructions. |
| eRegistry Options | All fields on page |
| eRegistry Certificate Information | All fields on page |

## *Member Resignation*

A Member may initiate the resignation of its MERS® System membership by providing written notice of Resignation to MERSCORP.

## Requirements: Member Resignation

- Member Resignation requests must be emailed to helpdesk@mersinc.org.
- Within sixty (60) calendar days of MERSCORP's acknowledgment, the Resigning Member must take the following actions on MERS® System:
  - For active MIN Records where the Resigning Member is named as Servicer:
    - If the servicing rights to the loan have been sold to a new Servicer that is a Member, a Transfer of Servicing Rights ("TOS") transaction must be initiated to that Member, or
    - If the servicing rights have been sold to a party that is not a Member, or if the Resigning Member will retain servicing rights to the loan, an Assignment from MERS or UCC-3 must be sent for Recordation, and the MIN Record must be deactivated as Transfer to Non-MERS Status (see Transfer to Non-MERS Status).
  - For active MIN Records where the Resigning Member is named as Investor:

**MERS˙**

- - If the beneficial rights to the loan have been sold to a new Investor that is a Member, a Transfer of Beneficial Rights ("TOB") transaction must be initiated by coordinating with the registered Servicer or Subservicer, or
  - If the beneficial rights have been sold to a party that is not a Member, or if the Resigning Member will retain beneficial rights to the loan, an Assignment from MERS or UCC-3 must be sent for Recordation, and the MIN Record must be deactivated as Transfer to Non-MERS Status (see Transfer to Non-MERS Status).
  - o For active MIN Records where the Resigning Member is named as Subservicer, the Servicer or Subservicer must perform a MIN Update to remove the Org ID from the Subservicer field (see MIN Update QRG).
  - o For active MIN Records where the Resigning Member is named as Interim Funder, the Interim Funder must remove its Org ID from the Interim Funder field (see Release Interim Funder Interests QRG).
- Within the same sixty (60) calendar days noted above, the Resigning Member must also:
  - o Meet any other conditions that MERSCORP may set for the Resignation of its membership, including the removal of the Resigning Member from any active eNotes on MERS® eRegistry.
  - o Remediate all outstanding Rules and Procedures violations that MERSCORP has notified the Member of (see Disciplinary Actions).
  - o Execute the *Completion of Resignation of Membership Attestation Form* to indicate that all applicable requirements set forth in Rule 1 of the Rules have been satisfied and email the executed form to helpdesk@mersinc.org.
- The Resigning Member is responsible for the prompt payment of any fees, charges, and assessments invoiced to it, including any invoices it receives after its Resignation.
- If the Resigning Member fails to complete the Resignation Requirements, the MERS Entities reserve the right to complete the Resignation and charge the Resigning Member for any costs incurred.
- Once Resignation is complete, the Resigned Member remains liable and obligated under the terms of the Governing Documents.

## Procedure: Member Resignation

1. A Member submits its Member Resignation request in writing by email to helpdesk@mersinc.org.

2. MERSCORP acknowledges the Member's request to resign in writing.

3. Once the Resignation Requirements are complete, MERSCORP resigns the Member's MERS® System membership.

## Certificates of Ownership

The Certificate of Ownership ("Certificate") process allows an authorized representative of an active Member ("Authorized Requestor") to claim MIN Records that incorrectly name a Resigning Member or Resigned Member as the current Servicer, Subservicer, or Investor.

MERSCORP grants an Org ID access to the Certificate process based upon Member request. Access to the Certificate process is obtained by providing the following information to SO-MERS-certificates@theice.com:

- The list of Org IDs for which access to the Certificate process is being requested.
- The name of each employee to be identified as an Authorized Requestor of the Member.

MERS

- The MERS® System User ID of each Authorized Requestor. The User ID must be active, and the associated user name must match the name of the Authorized Requestor.
- The business email address of the Authorized Requestor. The domain must match that of the Org ID.

By submitting this information, the Member asserts that the Authorized Requestor is authorized to commit the Member to the transfer transactions and resulting fees.

Once an Org ID has access to the Certificate process, the Authorized Requestor can submit online Certificates to authorize MERSCORP to initiate MIN Record transfer transactions to the active Member on behalf of Resigned Members or Resigning Members.

## Procedure: Certificates of Ownership

1. The Authorized Requestor logs on to the Online Certificate Submission request form and provides the following information to create the Certificate request:

   o The Certificate type.
   o The Org IDs of the previous Servicer, Subservicer, and Investor.
   o The Org IDs of the new Servicer, Subservicer, and Investor.
   o The list of MIN Records to be transferred.

2. Once the Authorized Requestor submits the Certificate, it is automatically forwarded to MERSCORP for review and approval.

## System Actions: Certificates of Ownership

Once a transfer transaction resulting from a Certificate has been initiated on MERS® System by MERSCORP, an email is sent from SO-MERS-certificates@theice.com to the Member's Operational - Primary contact that contains the Transfer Batch number to be confirmed.

# MERS® System Security

MERS® System uses ICE Single Sign-on ("ICE SSO") for user authentication. ICE SSO allows an authenticated user to access MERS® System, MERS® eRegistry, MERS® Member Website, and many other MERS® Corporate Applications in the same browser session without having to log on again.

ICE SSO provides an added layer of authentication with Two Factor Authentication (2FA). After a user enters valid login credentials, ICE SSO sends a random numeric code to the user's email address which must be entered on the *MERS® Login* page before access to MERS® System is granted.

ICE SSO supports an optional IP whitelisting feature at the Org ID level, which can be overridden at a user level. When IP whitelisting is enabled, ICE SSO only grants access to an Org ID from a range of IP addresses provided by the Member.

ICE SSO login credentials consist of a user's Global ID (user's work email address) and password. MERS® System users can change or reset their current password through ICE SSO using their work email address. User email addresses are updated by the Help Desk and update automatically for all ICE SSO enabled applications.

Any attempt to access MERS® System is denied until a user satisfies all the requirements of ICE SSO configured for the user's Org ID.

Note: The XML password for an Org ID is managed by a Member in MERS® System.

 MERS˚

# MERS® System User IDs

A user's MERS® System User ID is used to track user actions for auditing purposes and is included in certain MERS® System reports to identify the user.

A Member's internal MERS® System Administrator (Primary and/or Secondary) is responsible for establishing and maintaining the security settings that control access to its Org ID on MERS® System, including the following User ID management tasks:

- Create and maintain the security roles that align with the Member's operations.
- Create and maintain a unique User ID for each employee of the Member that requires online access to MERS® System and/or Member website.
- Enable, disable, and "delete" User IDs.

Note: While a "deleted" User ID cannot be used to access MERS® System, it is not actually deleted; it remains in MERS® System for display on reports and milestones. Once deleted, a User ID can be reinstated, but only for the same user.

When a new user is created in MERS® System, a Global ID is automatically created for the user in ICE SSO with access to the Member Website and other supporting MERS® Corporate Applications provisioned for the user. Changes to a MERS® System User ID automatically update the user's SSO Global ID but not the user's MERS® eRegistry User ID. See the MERS® System User Guide or System Administrator QRG for step-by-step instructions.

## Requirements: System Security

- MERS® System User IDs and ICE SSO login credentials must not be shared by multiple individuals.
- MERS® System User IDs and ICE SSO login credentials must only be provided to employees of the Member.
- A Member must set up a Vendor relationship in the Member Profile of its Org ID to grant a third-party Vendor access to perform functions on behalf of the Member.
- A Vendor must access MERS® System using its own Org ID.
- When a Vendor submits transactions to MERS® System using the Flat-File or XML interface, the Vendor's Org ID must be included in the field that identifies the Vendor.
- Once a Member ends a relationship with a Vendor, the Member must promptly remove the Vendor relationship from the Member Profile of its Org ID.
- At least one User ID for the Member must have the ability to maintain the Member Profile, and the person associated with the User ID must be responsible for reviewing and updating this information.
- Security roles that are no longer required by the Member must be deleted.
- A user's MERS® System access must be promptly disabled or deleted upon employee termination or resignation and must be modified as appropriate when the employee's duties and responsibilities change with respect to MERS® System.
- User access to MERS® System must be reviewed at least annually to determine if any changes are necessary based on the employee's current duties and responsibilities.

    Note: When conducting a MERS® System user access review, it is important to consider that the logon credentials also provide a user with access to the Member website.

 MERS˙

## Third-Party Vendors

Subject to approval by MERSCORP, a Member may grant security access to its Org ID to third-party Vendors to process the following transactions on its behalf:

- o  Registrations
- o  Transfers
- o  Deactivations
- o  Updates
- o  Inquiries

The Member sets up this access by creating a relationship with a Vendor in MERS® System (see Vendor Relationships QRG for instructions).

**A Member is not permitted to set up a User ID under its Org ID for a third-party.**

## Associated Members

MERS® System allows a Servicer or Subservicer to name other active Members as an Associated Member on a MIN Record which grants them inquiry-only access to that MIN Record. The following types of Associated Members are available:

- •  Collateral Agent
- •  FHLB/FRB
- •  Government Housing Agency
- •  Master Servicer
- •  Mortgage Insurance Co.
- •  Trustee
- •  Warehouse/Gestation Lender
- •  Alternate Custodian
- •  Participation Investor
- •  Property Preservation Company
- •  Other

Associated Members can choose to receive the optional *Change Notification (VB)* and *MIN Milestones (VA)* reports for the MIN Records on which they are named.

The addition of Associated Members at Registration is reported on the *Registration Verification (RF)* or *Seasoned Registration Rejects/Warnings (RB)* report. Further changes to Associated Members are reported on the *Maintenance Verification (MA)* report.

## XML and Batch Inquiry Transactions

MERS® System provides two (2) different methods for Members and their Vendors to perform automated searches on registered loans based on MIN, property address, or borrower Social Security Number ("SSN"): XML Inquiry and Batch Inquiry.

### XML Inquiry

XML Inquiry is a synchronous or real-time method of submitting search requests to MERS® System through the XML Interface. It is available during and outside normal processing hours but not while maintenance is being performed. Both Summary and Status Inquiries are supported. The fields included in the search results vary based on the requesting Member's affiliation to the MIN Record.

 MERS

## Batch Inquiry

Batch Inquiry is an asynchronous method of submitting search requests to MERS® System through the Flat-file Interface. It is available during normal processing hours but not while maintenance is being performed. Both Summary and Status Inquiries are supported. The fields included in the search results vary based on the requesting Member's affiliation to the MIN Record. Batch Inquiry is not "real-time" like XML Inquiry, but Batch Inquiry can support a much higher volume of inquires compared to XML Inquiry.

For more information about XML and Batch Inquiry, including the data returned in the Summary and Status Inquiries and the transaction limits of each, see the MERS® System Integration Handbook.

# Mortgage Identification Number ("MIN")

The Mortgage Identification Number ("MIN") is an 18-digit number that uniquely identifies a Mortgage loan registered on MERS® System. A MIN is assigned to a loan at or prior to closing and cannot be duplicated or reused. To process information on MERS® System, the MIN associated with the loan must be provided. The MIN is also placed on any MERS Document sent for Recordation (see MERS Documents for details).

A MIN consists of a three-part, 18-digit string in the following format:



- **Component One (1):** The seven (7) digit Org ID that uniquely identifies a Member. In the example above, the Org ID is **9594567**.
- **Component Two (2):** A unique, ten (10) digit Sequence Number assigned by the Member. The Sequence Number can be an internal reference number used by the Member, or it can be randomly generated. In the example above, the Sequence Number is **0123456789.**
- **Component Three (3):** A one (1) digit Check Digit calculated by the Member using the Mod 10 Weight 2 Algorithm. In the example above, the check digit is **eight (8).**

MERS® System validates a MIN at Registration by checking for duplicate MINs, ensuring that the check digit is correct, and validating that the first seven digits of the MIN match an Org ID that has been setup on MERS® System.

## *Procedure: Creating a MIN*

1. The Member uses the seven-digit Org ID assigned by MERSCORP for component 1 of the MIN.

2. The Member determines the unique ten (10) digit Sequence Number for component 2 of the MIN.

3. The Member generates the Check Digit for component 3 of the MIN. See the MERS® System Integration Handbook for the step-by-step calculation of the Check Digit.

Note: Most Loan Origination Systems ("LOS") are capable of generating MINs programmatically. Members interested in the MIN generation capabilities of their LOS should contact the company that supports their LOS.

 MERS˚

# Loan Registration

The Registration transaction is used to enter the required information on MERS® System to report that a MERS Loan exists. The result of a successful Registration is the creation of a MIN Record for the loan.

A Registration transaction may be submitted using the MERS® System UI or the Flat-File or XML interfaces.

Note: The Registration transaction is also used to register an iRegistration loan on MERS® System. See Procedures: iRegistration Loans for details.

Once a Mortgage loan is registered on MERS® System, the eClosing video associated with the loan can be uploaded to the MERS® RON Video Storage solution by a RON Closing Provider. While the eClosing video is available in the MERS® RON Video Storage solution, it can be downloaded by the RON Closing Provider that uploaded the video and the current Investor, Servicer, or Subservicer named on the MIN Record. See the MERS® RON Video Storage chapter for details.

## *Requirements: Loan Registration*

In this section, the requirements for registering a loan on MERS® System are organized into the following categories:

- All Loan Registrations: These requirements apply to all loan registrations.
- MOM Loan Registrations: These requirements apply to all MOM loan registrations.
- Non-MOM Loan Registrations: These requirements apply to all Non-MOM loan registrations.

In addition, the MERS® System Data Integrity requirements apply to all loan registrations unless noted otherwise.

## Requirements: All Loan Registrations

- All applicable conditionally-required loan information on MERS® System must be provided at Registration with the exception of the Originating Organization for a Non-MOM loan.
- The purchaser of an unregistered MERS Loan must take the necessary steps to ensure that it is registered on MERS® System no later than seven (7) calendar days after the date upon which the purchaser begins servicing the loan on its System of Record.

  Note: While a Member that purchases an unregistered MERS Loan can request that the seller register it on MERS® System, the purchaser, as the current Servicer, remains responsible for ensuring that the loan is in compliance with the requirements set forth in the Governing Documents.

- Once a MIN Record has been correctly deactivated on MERS® System, if a Member re-registers the loan, it must be re-registered using the same MIN. Upon re-registration:
  - o  If the Mortgage has been assigned to MERS, the loan must be re-registered as a Non-MOM even if it was a MOM loan when initially registered.
  - o  If the Mortgage has been assigned to an entity other than MERS, the loan must be re-registered as an iRegistration.
- When a Member will register a Mortgage on both MERS® eRegistry and MERS® System, the loan must be registered on MERS® eRegistry before it is registered on MERS® System.

 MERS˙

## Requirements: MOM Loan Registrations

- The MOM Security Instrument or UCC-1 must be prepared and executed in accordance with the applicable document requirements (see MERS Documents) and must be sent for Recordation even if the jurisdiction does not require it.
- A Member must register on MERS® System any MOM loan that it has closed, or any unregistered MOM loan that it has purchased or otherwise acquired.
- A MOM loan must be registered no later than seven (7) calendar days after the Note Date, or Funding Date for refinance loans or loans in escrow states, even if the rights to the loan are immediately sold to a non-Member.

## Requirements: Non-MOM Loan Registrations

- The Assignment to MERS or UCC-3 must be prepared and executed in accordance with the applicable document requirements (see MERS Documents) and must be sent for Recordation even if the jurisdiction does not require it.
- A Member must register on MERS® System any loan with a Mortgage that it has assigned to MERS post-origination, or any unregistered Non-MOM it has purchased or otherwise acquired.
- A Non-MOM loan must be registered no later than seven (7) calendar days after the Assignment to MERS or UCC-3 was executed even if the rights to the loan are immediately sold to a non-Member.
- When MERS becomes Mortgagee for a previously registered iRegistration loan, the Conversion transaction must be performed no later than seven (7) calendar days after the Assignment to MERS or UCC-3 was executed.
- The Originating Organization on a Non-MOM loan must be provided no later than 90 calendar days after the Registration Date.

## *Requirements: MERS® System Data Integrity*

When registering a loan on MERS® System, the registering Member must validate that the data on MERS® System matches its System of Record. The Member's System of Record is the source of data for MERS® System.

The following data integrity requirements apply to the data on the Servicer's System of Record or to the Subservicer's System of Record if one is named on MERS® System.

| MERS® System Field... | Must Match on the Member's System of Record ... |
|---|---|
| MIN Record Status | The loan's status. |
| Original Borrower Name(s) | The exact name(s) of the original individual borrowers. |
| Current Borrower Name(s) | The exact full name of each current individual Borrower, including middle name or initial. For a borrower with only one name see Corporate Name(s) below. |
| Corporate Name(s) | One of the following:<br>• The exact name(s) of the non-individual borrower(s), or<br>• The exact name of a borrower with only one name. |
| Primary Borrower SSN or Tax ID ("TIN") | The Primary Borrower's valid SSN or TIN, except as follows:<br>• **1 1 1 - 1 1 - 1 1 1 1**: Used for foreign national with no SSN or TIN. |



| MERS® System Field... | Must Match on the Member's System of Record ... |
|---|---|
| | • **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:** A temporary placeholder used while a Member investigates a Borrower Dispute or when a borrower contacts the Member directly to initiate the dispute.<br>• No other placeholder values are permitted for SSN or TIN.<br>• SSN or TIN must not be entered into any other field on MERS® System. |
| | Note: SSN is required for a Primary Borrower, and TIN is conditionally required for a corporate borrower. |
| Property Address | The property address associated with the loan.<br>• Street Number is not required for a property without a street number like a rural route address.<br>• For a Co-op, the unit number is entered in the Unit Number field. |
| County/Place Code | The county where the property is located (County Name, FIPS Code, or ANSI Code). When possible, use either the County or Place code to reduce the possibility of **County Unknown** warnings in your transactions. |
| Note Date | The date of the Note.<br>• Note Date is optional on MERS® System for a Pre-Closing.<br>• For a CEMA Loan, the date of the consolidated Note. |
| Note Amount | The amount of the Note except as follows:<br>• For a reverse Mortgage loan, the Maximum Principal Amount from the Note.<br>• For a CEMA Loan, the amount from the consolidated Note. |
| MOM Indicator | Identifies how MERS acquired its present interest as Mortgagee. |
| Lien Type | The type of lien associated with the loan (1st lien or subordinate lien). |
| Owner Occupied | The designation of the property's occupancy at origination (Yes, No). |
| | Note: The Servicing Member may, at its discretion, update the value of the Owner Occupied field to reflect the current owner occupancy status of the property. Each Member is responsible for ensuring that their internal policy for determining whether a property is owner occupied is reflected on MERS® System. |
| Investor | The entity that owns or holds the promissory note secured by a Mortgage. |
| Servicer | The entity that owns the Servicing Rights of a Mortgage loan. If the Investor is the owner of the Mortgage Servicing Rights, but another entity performs the primary servicing obligations for the loan, the entity that performs the primary servicing obligations for the loan is the Servicer for the purposes of this definition. |
| Subservicer | The entity that the Servicer of a loan has contracted with to perform certain servicing functions for the loan. |
| Property Preservation Company | The name of the Property Preservation Company maintaining the property on behalf of the Servicer. |
| Originating Org ID | For MERS Loans, the Org ID of the loan originator if that entity was a Member at origination. The organization's name and Org ID displays in the Originating Organization field. Required for all MOM loans with a Note Date after March 31, 2012. |

**MERS**

1. The registering Member enters the MIN assigned to the loan on the *Register a MIN* page.

2. MERS® System displays a summary of the loan information along with the *Re-Registration* menu.

3. The registering Member:

   o  Enters the Org ID of any new Primary Organization including Servicer and Investor, and

   o  Verifies all loan information and updates it to ensure that it matches the Member's System of Record and as specified in Requirements: MERS® System Data Integrity.

4. The registering Member re-registers the loan.

5. The registering Member reports any assumptions that occurred since the Registration Reversal transaction was processed (see Assumption of Mortgage).

Refer to System Actions: Loan Registration for details on the system actions that occur after a loan is re-registered on MERS® System.

## Procedure: Re-registration after Deactivation

If a loan is correctly deactivated on MERS® System for any reason other than **Foreclosure Complete** or **Paid in Full** and subsequently needs to be re-registered, it is re-registered using the same MIN (see Re-registration after Deactivation QRG).

1. The registering Member enters the MIN assigned to the loan on the *Register a MIN* page.

2. MERS® System displays the loan information on the *Registration Details* page.

3. The registering Member:

   o  Enters the Org ID of any new Primary Organization including Servicer and Investor, and

   o  Verifies all loan information and updates it to ensure that it matches the Member's System of Record and as specified in Requirements: MERS® System Data Integrity.

4. The registering Member re-registers the loan.

5. The registering Member reports any assumptions that occurred since the loan's deactivation (see Assumption of Mortgage).

Refer to System Actions: Loan Registration for details on the system actions that occur after a loan is re-registered on MERS® System.

## *System Actions: Loan Registration*

After the Registration of a loan on MERS® System, the following events occur:

- A MIN Record is created for a newly registered loan with a status of **Active (Registered)** or **Pre-Closing**.

- For a Re-registration, the status of the existing MIN Record changes to **Active (Registered)** or **Pre-Closing** for a Registration Reversal or a Deactivation Reversal.

- The appropriate registration or conversion transaction is listed on the *Milestones* page. For a Post-Closing registration, the Registration Date reflects the date that the Post-Closing registration was processed.

- The appropriate registration fee appears on the Member's next monthly invoice from MERSCORP:

   o  The fee is normally charged to the Member that submitted the Registration transaction.

**MERS**

- o The exception to this rule is for a Vendor with an Org ID configured to bill the Member on whose behalf the Vendor submits transactions. In this scenario, the fee is charged to the Member for whom the Vendor submitted the registration and not the Vendor.

- Successful Registrations are reported on one of the following optional verification reports:

  - *Conversion Verification (CF)*
  - *Registration Verification (RF)*

  - *Seasoned Registration Verification (RA)*
  - *Pre-Closing Registration Verification (PF)*
  - *Registration Reversal Verification (RK)*

- Successful Registrations are reported to Associated Members on the *MIN Milestones (VA) Report*.

- Unsuccessful Registrations submitted through the Flat-File Interface are reported on one of the following mandatory reject reports:

  - *Conversion Rejects/Warnings (CG)*
  - *Registration Rejects/Warnings (RG)*

  - *Seasoned Registration Rejects /Warnings (RB)*
  - *Pre-Closing Registration Rejects/Warnings (PG)*
  - *Registration Reversal Rejects/Warnings (RL)*

- If the current primary borrower SSN, property, and first lien information of a newly registered MIN Record matches another active MIN Record, it is reported on the mandatory *MINs for the Same Primary Borrower SSN, Property, and First Lien- Daily (RH) Report* and the *MINs for the Same Primary Borrower SSN, Property, and First Lien- Monthly (RI) Report*.

- If the MIN of a newly registered loan on MERS® System matches the MIN of a Digital Asset registered on MERS® eRegistry, and the borrower names or property address information on the two MINs do not match, the MIN is listed on the *Mismatched MIN/eNote Record (EJ) Report.*

- If an Originating Organization is not entered on a Non-MOM within sixty (60) calendar days after registration, it is reported on the *MINs Without Originating Organization (QE) Report* if the Note Date is after March 31, 2012.

- If the Member that registered a loan is not the Servicer or Subservicer named on the MIN Record, the registering Member:

  - o Can update the MIN Record for a period of time that ends six (6) calendar days after the Registration Date.

  - o Cannot update the MIN Record if a TOS transaction is completed during the six (6) calendar days following the Registration Date unless it is named as the Servicer or Subservicer on the MIN Record after the transfer occurs.

  - o Has no access to a MIN Record once it can no longer update the MIN Record unless it is also named as a Primary Organization or an Associated Member.

- Only the Servicer or Subservicer can update the MIN Record on or after the seventh day following the Registration Date.

- Any data in the Funding Date field is automatically removed sixty (60) days after Registration and is reported on the *Maintenance Verification (MA) Report* and documented on the *MIN Audit* page.

## *Registration Reversal*

- The Registration Reversal transaction is used in the limited circumstances detailed in this section to correct errors in the registration of a loan on MERS® System. Other loan information errors must be corrected by the Servicer or Subservicer through a MIN Update.

- **The Registration Reversal transaction is not a Deactivation transaction.** It is not the correct transaction to deactivate a MERS Loan because a Lien Release, Assignment from MERS or UCC-3 has been sent for Recordation or MERS's interest has otherwise been extinguished (e.g. in foreclosure or

 **MERS**

bankruptcy). For the correct deactivation transaction to use in these contexts, see MIN Record Deactivation.

- A Registration Reversal may be submitted through the MERS® System UI or Flat-File Interface.

## Requirements: Registration Reversal

- For a loan registered on MERS® System as a MOM or Non-MOM loan, the Registration Reversal transaction must be performed no later than seven (7) calendar days after determining that MERS was never the Mortgagee.
  - o This might occur in the following scenarios:
    - A loan is rescinded by the borrower during the rescission period, and the Mortgage is never sent for Recordation.
    - A loan is registered as a Pre-Closing, does not close at a later date, and a Mortgage is never sent for Recordation.
    - A loan is mistakenly registered as a MERS Loan, but MERS is not the Mortgagee.
      - ✓ If the Member intends to track the loan on MERS® System, it must be re-registered as an iRegistration loan (see iRegistration Loan Registration).
- If MERS was ever Mortgagee, a Registration Reversal is only appropriate in the following limited circumstances:
  - o A loan was erroneously registered using a different MIN than that which appears on the Mortgage. The Registration Reversal transaction must be used to reverse the initial Registration and then the loan must be re-registered using the correct MIN.
  - o If a Member erroneously sent a MOM Security Instrument for Recordation on a loan that did not close, the lien must be released and the loan registration must be reversed using the Registration Reversal transaction. See Requirements: Paid in Full Deactivation for the requirements to which the Lien Release, UCC-3, or Deed-in-Lieu must conform.
  - o A loan was registered identifying an incorrect Servicer and/or Investor. The Registration Reversal transaction must be used to reverse the initial registration, and the loan must be re-registered using the same MIN with the correct Servicer and Investor identified.
  - o A MERS Loan was incorrectly registered as an iRegistration. The Registration Reversal transaction must be used to reverse the initial registration, and the loan must be correctly re-registered using the same MIN to identify it as a MOM or Non-MOM loan.
  - o If incorrect information was entered for a Pre-Closing loan before the loan closes, the Registration Reversal transaction may be performed and the loan re-registered with the correct information.

Note: Another option for resolving a discrepancy between the MIN used to register a loan on MERS® System and the MIN appearing on the corresponding Mortgage recorded in the public land records is to send a document (e.g. *Mortgagee's MIN Affidavit*) for Recordation to clarify that the MIN associated with the loan on MERS® System is correct.

## Procedure: Registration Reversal

To perform a Registration Reversal:

1. The Servicer, Subservicer, or Member that registered the loan verifies that the *Registration* can be reversed.
   - o The Registration cannot be reversed while a MIN Record is in a pending transfer transaction (TOS, TOB, or TOS/TOB Combo).

**MERS°**

- o The Servicer or Subservicer can perform a Registration Reversal at any time so long as the Servicer and Investor named on the MIN Record at Registration have not changed as the result of a completed transfer transaction.

- o If the Member that registered the loan is not the Servicer or Subservicer, the registering Member can reverse the Registration for a period of time that ends six (6) days after the Registration Date.

- o Once a transfer transaction is completed on a MIN Record:

   - The Registration can only be reversed if the Servicer and Investor fields on the MIN Record contain the same Org ID.

   - The registering Member can no longer reverse the Registration (if the transfer completed during the six (6) days following the Registration Date) unless it is named as the Servicer or Subservicer on the MIN Record after the transfer occurs.

2. The Servicer, Subservicer, or Member that registered the loan processes the Registration Reversal if it determines that a Registration Reversal is appropriate (see Reversals QRG).

## System Actions: Registration Reversal

When the Registration Reversal transaction is performed on a MIN Record:

- The MIN Record status changes from **Active (Registered)** to **Registration Reversal.**

- The MIN Record no longer displays on MERS® ServicerID or the Servicer Identification System ("SIS").

- All reversed registration information is retained for use if the loan is re-registered.

- No fee is incurred for a Registration Reversal, but the applicable Registration fee is assessed for the initial registration and any subsequent re-registration of the loan.

- The *Registration Reversal* is listed on the *Milestones* page.

- Successfully processed Registration Reversal transactions are reported on the optional *Registration Reversal Verification (RK) Report*.

- Unsuccessful **Registration Reversals** submitted through the Flat-File Interface are reported on the *Registration Reversal Rejects/Warnings (RL) Report*.

# MERS® RON Video Storage

The MERS® Remote Online Notarization ("RON") Video Storage solution ("RON Video Storage") provides the mortgage industry a reliable, secure, long-term storage repository for the eClosing videos associated with mortgage loans registered on MERS® System and/or MERS® eRegistry. The RON Video Storage solution also supports the upload of eClosing videos for loans that are not yet registered on MERS® System or MERS® eRegistry. A successfully uploaded eClosing video for an unregistered loan is held for 10 days after its upload date to await the loan's subsequent registration. An eClosing video uploaded to RON Video Storage solution is an Authorized Member Copy of the Notary Retention Copy.

RON eClosing videos can be uploaded to and downloaded from the RON Video Storage solution manually using the MERS® System user interface or programmatically using the MERS® System XML Interface. Only a Member with an Org ID that has the RON Closing Provider Line of Business (LOB) is able to upload eClosing videos to the RON Video Storage solution. During upload, a security scan is performed on the file and a digital fingerprint is generated to uniquely identify the video to ensure that future downloads match the originally uploaded video. The RON Video Storage solution encrypts video files at rest. eClosing videos with the same filename can be uploaded for the same MIN and are not over-written.

 MERS°

Once a video is uploaded to the RON Video Storage solution, it is stored and remains available for the duration of the Storage Period and is destroyed thereafter. While the video is available, it can be downloaded by the RON Closing Provider that uploaded the video and the following Rights Holders associated with the loan:

- **MERS® System:** Current Investor, Servicer, Subservicer.
- **MERS® eRegistry :** Current Controller, Master Servicer, Subservicer.

RON Video Storage Participants can also submit a RON *XML Inquiry* transaction to request information about registered loans with eClosing Videos stored in the solution.

## RON Closing Provider LOB

The **RON Closing Provider** LOB is assigned to an Org ID by MERSCORP to authorize that Member to upload eClosing videos to the RON Video Storage solution and download a copy of its previously uploaded videos for verification purposes. An Org ID assigned only the **RON Closing Provider** LOB cannot perform other MIN Record transactions on MERS® System, but the **RON Closing Provider** LOB can be assigned to an Org ID along with any other LOB except Vendor/Service Provider to provide the Org ID permission to perform MIN Record transactions.

## Requirements: MERS® RON Video Storage

## Video Upload Requirements

The following requirements apply to the upload of an eClosing video to RON Video Storage:

- An eClosing video must only be uploaded to the RON Video Storage solution at the instruction of a Directing Member that has express permission to receive and retain an Authorized Member Copy of the eClosing video from the RON Notary or, if applicable in a particular state, the RON Closing Provider whose platform created the eClosing video.
- Each eClosing video submitted to the RON Video Storage solution for upload must be:
  o Identical to the Notary Retention Copy,
  o Tamper-sealed when created or otherwise unmodified since its creation, and
  o Consist of an accurate, complete audio-video recording, compliant with applicable notarial law and consisting of one or more notarial acts conducted in a single session.
- The following data from the mortgage loan is required during upload and must match the corresponding value stored on MERS® System and/or MERS® eRegistry:
  o MIN
  o The last 4-digits of a Borrower's SSN or TIN
  o The ZIP Code associated with the Property
- The following data about the Notary Public that witnessed the eClosing is required when uploading a RON eClosing video:
  o Notary Public Name                    o Notary Commission Number
  o Notary Commission State               o Notary Commission Expiration Date

  Note: Enter the literal "None" in the **Notary Commission Number** field if the state issuing the Notary Public's commission does not use a number to identify a specific notary public.
- The following additional data is also required when uploading a RON eClosing video:
  o RON Video Type



- o   Authorizing Member Org ID (Member authorizing upload of their copy of the RON video)
    Only the following Members on a MIN Record may be the Authorizing Member:
    - ▪   MERS® System: Current Investor, Servicer, Subservicer, or Originating Org ID
    - ▪   MERS® eRegistry: Current Controller, Master Servicer, or Subservicer
- •   The eClosing video file must meet the following requirements:
    - o   Total video size must be less than or equal to (≤) 575 Megabytes (MB).
    - o   The video must have one of the following file extensions:

| | | | | |
|---|---|---|---|---|
| ▪   .AVI | ▪   .M4V | ▪   .MOV | ▪   .MP4 | ▪   .WEBM |
| ▪   .MPEG | ▪   .MPG | ▪   .OGM | ▪   .OGV | ▪   .WMV |

- •   The Directing Member and the Member uploading an eClosing video are responsible for ensuring that the video is associated with the correct MIN and/or Electronic Record.

## File Name, Notary Name, and Commission Number Requirements

The following requirements apply to the **File Name, Notary Name,** and **Notary Commission Number** fields when uploading an eClosing video to the RON Video Storage solution:

- •   Leading or trailing spaces are trimmed from the data provided for the **File Name, Notary Name,** and **Notary Commission Number** fields.
- •   The **File Name** and **Notary Commission Number** fields:
    - o   Are alphanumeric and support the following additional characters:

| Name | Symbol | Name | Symbol |
|---|---|---|---|
| Space | | Hyphen | - |
| Underscore | _ | Full Stop | . |

- o   Must contain values that:
    - ▪   Include at least one letter or number,
    - ▪   Start with a letter or number, and
    - ▪   Not end with a dot.
- •   The **Notary Commission Number** and **Notary Name** fields have a maximum permitted length of 100 characters.
- •   The File Name field has a maximum permitted length of 255 characters.
- •   The **Notary Name** field is alphanumeric and also support the following additional characters:

| Name | Symbol | Name | Symbol | Name | Symbol |
|---|---|---|---|---|---|
| At Sign | @ | Dash | - | Ampersand | & |
| Hash Tag | # | Full Stop | . | Comma | , |
| Parentheses | ( ) | Question Mark | ? | Single Quote | ' |
| Underscore | _ | Colon | : | Double Quote | " |
| Forward Slash | / | Space | | | |

 MERS˙

# Procedure: Upload RON eClosing Video

The process to upload a RON eClosing video to the RON Video Storage solution begins after the Notary Public has witnessed the borrowers close the mortgage loan with the eClosing memorialized as a video file using the RON Closing Provider's platform.

1. A Member with the RON Closing Provider LOB uploads the eClosing video to the RON Video Storage solution:

    o For step-by-step instructions on manually uploading an eClosing video using MERS® System, see the Upload RON eClosing Video QRG.

    o For technical information on using an XML API client to programmatically upload an eClosing video to the RON Video Storage solution, see the MERS® RON Video Storage Integration Handbook.

2. Once the video is successfully uploaded, a confirmation message is returned.

# System Actions: Upload RON eClosing Video

The actions the MERS® RON Video Storage solution performs for a successfully uploaded eClosing video varies based on whether the loan was previously registered on MERS® System or MERS® eRegistry. For details see:

- Previously Registered Loan or
- Unregistered Loan

## Previously Registered Loan

The RON Video Storage solution performs the following actions when a video is successfully uploaded for a loan registered on MERS® System or MERS® eRegistry:

- Generates a digital fingerprint of the video to uniquely identify the file to ensure that future downloads match the originally uploaded video.
- Encrypts the video at rest in the database.
- Associates the eClosing video with the loan by:

    o Setting the **RON Video** indicator on the MIN and/or Electronic Record to **Yes,** and

    o Recording the upload in the *RON Event Log* for the loan.

- Reports the upload on the *RON Video Submission Verification (VS) Report* if your organization has this optional report enabled in its Member Profile.
- Creates a billing record for the video upload that will appear on the next monthly invoice of the Member that uploaded the video.

## Unregistered Loan

The RON Video Storage solution performs the following actions when a video is successfully uploaded for a loan that is not yet registered on MERS® System or MERS® eRegistry:

- Generates a digital fingerprint of the video to uniquely identify the file.
- Encrypts the video at rest in the database.
- Reports the pending eClosing video on the mandatory *RON Video Storage Cycling (VC) Report* while it awaits the loan's registration during the 10-day cycling window.
- If the loan is registered during the 10-day cycling window, the standard RON video upload validations are performed.

**MERS**

- o If the validations pass, the RON Video Storage solution:
    - Associates the eClosing video with the loan by:
        - ✓ Setting the **RON Video** indicator on the MIN and/or Electronic Record to **Yes**, and
        - ✓ Recording the upload in the *RON Event Log* for the loan.
    - Reports the association of the eClosing video with the registered loan on the *VC Report* with a final status of **Accepted**.
    - Reports the video upload on the optional *VS Report*.
    - Creates a billing record for the next monthly invoice of the Member that uploaded the video with the upload date set to the date that the video was matched to the loan.
  - o If any upload validation fails during the *Registration* process, the RON Video Storage solution:
    - Rejects the pending RON video upload and permanently deletes it from the solution.
    - Reports the rejected video upload on the Member's *VC Report* with a final status of **Rejected**.
- If the loan is not registered during the 10-day cycling window, the RON Video Storage solution:
  - o Expires the pending RON video upload and permanently deletes it from the solution.
  - o Reports the expired video upload on the Member's *VC Report* with a final status of **Expired**.

Note: Members are not billed for rejected or expired video uploads, and no entry is recorded in the *RON Event Log* for rejected or expired video uploads if the loan is subsequently registered.

## Procedure: Download RON eClosing Video

1. After an eClosing video is stored in the RON Video Storage solution, it is available for download using the loan's MIN as search criteria.
   - o For step-by-step instructions on manually downloading an eClosing video using MERS® System, see the Download RON eClosing Video QRG.
   - o For technical information on using an XML API to programmatically download an eClosing video to the RON Video Storage solution, see the MERS® RON Video Storage Integration Handbook.
2. Once the video is successfully downloaded, a confirmation message is returned.

## System Actions: Download RON eClosing Video

The RON Video Storage solution performs the following actions when a video is successfully downloaded:

- Validates the video's digital fingerprint against the value generated when the file was uploaded.
- Creates the appropriate billing record for the download that will appear on the next monthly invoice of the Member that downloaded the video.
- Records the download in the *RON Video Event Log* for the MIN.
- Reports the download to the Member on the optional *RON Video Retrieval Verification (VR) Report*.

## Procedure: View RON Video Event Log

The MERS® System *RON Video Event Log* page allows a Member to review the list of RON Video events that have occurred for a loan registered on MERS® System and/or MERS® eRegistry.

1. The user searches for the *RON Video Event Log* for a registered loan using its MIN, and the *Event Log* details display to the user.

 MERS®

Note: A RON Closing Provider only has access to events in the *RON Video Event Log* that are associated with eClosing videos that it uploaded.

For step-by-step instructions on reviewing the RON Video Event Log for a registered loan , see the View RON Video Event Log QRG.

# Interim Funding Interests

A warehouse lender provides funds to a Lender to fund a Mortgage loan for a borrower and has an Interim Funding Interest in the loan prior to its sale in the secondary market. The warehouse lender may require that its interest in the loan be reported to MERS® System. MERS® System provides the following two fields to track Interim Funding Interests prior to the loan's sale to the permanent Investor:

- **Interim Funder:**
  - o An optional Primary Organization field that is entered by the Member registering the loan to report the warehouse lender's interest in the loan.
  - o An Interim Funder can only be added to a Flow Loan if the Servicer and Investor fields have the same Org ID. When this condition is not met, the Warehouse/Gestation Lender field can be used.
  - o An Interim Funder's Org ID is removed from a MIN Record:
    - ▪ Automatically when a TOB Option 1 Batch is completed, or
    - ▪ By the Interim Funder when it no longer has an interest in the loan.
- **Warehouse/Gestation Lender:**
  - o An optional Associated Member field that is entered by the Member registering the loan to reflect the warehouse lender's interest in the loan.
  - o A Warehouse/Gestation Lender's Org ID is removed from a MIN Record:
    - ▪ Automatically when a TOB Option 1 Batch is completed,
    - ▪ Automatically when a TOS Batch or TOS/TOB Combo Batch is completed, or
    - ▪ By the Servicer or Subservicer when the Warehouse/Gestation Lender no longer has an interest in the loan.

## *Requirements: Removing Interim Funding Interests*

Once a Member no longer has an interim financial interest in a registered loan, its Org ID must be removed from the **Interim Funder** or **Warehouse/Gestation Lender** fields if it was not automatically removed by a completed Transfer Batch.

- A Member removes its Org ID from the **Interim Funder** field using the *Release Interim Funder Interests* transaction.
- The Servicing Member removes a Member's Org ID from the **Warehouse/Gestation Lender** field using the *MIN Update* transaction.

## *Procedure: Removing an Interim Funding Org ID*

An Interim Funder's or Warehouse/Gestation Lender's Org ID may be removed from a MIN Record by MERS® System during the completion of a Transfer Batch or by a Member using the MERS® System UI or Flat-File Interface.

- **Interim Funder:** An Interim Funder removes its Org ID from a MIN Record using the *Release Interim Funder Interests* transaction (see Release Interim Funder Interests QRG).

**MERS**

- **Warehouse/Gestation Lender:** The Servicer or Subservicer removes the Warehouse/Gestation Lender's Org ID using a MIN Update (see MIN Update QRG).

# System Actions: Removing an Interim Funding Org ID

- When a TOB Option 1 Batch is completed, any Interim Funder or Warehouse/Gestation Lender named on a MIN Record is removed.

- When a TOS Batch or TOS/TOB Combo Batch is completed, any Warehouse/Gestation Lender named on a MIN Record is removed.

- The removal of an Interim Funder or Warehouse/Gestation Lender from a MIN Record appears on the *Milestones* page.

- The removal of an Interim Funder from a MIN Record is reported on the optional *Release of Security Interests by Interim Funder (IB) Report*.

- The removal of a Warehouse/Gestation Lender from a MIN Record is reported on the optional *MIN Milestones (VA)* and *Change Notification (VB) Reports*.

- Completed TOB Option 2 Batches that name an Interim Funder or Warehouse/Gestation Lender are reported on the *Co-Existing Security Interests (IA) Report*.

- If a **Release Interim Funder Interests** transaction is rejected, it is reported on the mandatory *Interim Funder Rejects (IC) Report*.

- If a MIN Update to remove a Warehouse/Gestation Lender is rejected, it is reported on the mandatory *Maintenance Rejects/Warnings (MB) Report*.

# Transfers

There are three (3) types of transfer transactions on MERS® System, which are used to report that the contractual servicing rights or the beneficial ownership interests of a registered loan are transferred to another Member:

- Transfer of Beneficial Rights ("TOB")
- Transfer of Servicing Rights ("TOS")
- TOS/TOB Combination ("TOS/TOB Combo")

Servicing rights and beneficial ownership interests are not transferred on, through, or by MERS® System. MERS® System only tracks changes in these interests as reported by Members.

For instructions on processing *Transfer* transactions on the MERS® System UI, please refer to:

- Transfer of Beneficial Rights, Option 1 QRG
- Transfer of Beneficial Rights, Option 2 QRG
- TOB Option 2 Confirmations QRG
- Transfer of Servicing Rights QRG
- TOS Transfer Confirmations QRG
- Transfer Transactions Responsibilities QRG
- MERS® System User Guide

Note: In the transfer-related requirements, the designations of "new" and "old" reflect the Member's relationship to a loan after the *Transfer* transaction has completed on MERS® System. For example, the Member identified as the current Servicer in a TOS Batch is referenced in the requirements as the "old" Servicer.

 **MERS**

## *Transfer of Beneficial Rights*

The Transfer of Beneficial Rights ("TOB") transaction is used to report the transfer of the beneficial ownership interests of an active, registered Mortgage loan from one Investor to another. A new Document Custodian can also be named as part of the TOB transaction. The current Document Custodian can also be deleted, or it can remain on the MIN Record.

A TOB transaction may be submitted through the MERS® System UI or Flat-File Interface. When a TOB transaction is initiated, a Transfer Batch is created on MERS® System for the MIN Records to be reported as transferred. There are two types of TOB transactions on MERS® System: Option 1 and Option 2. The option used depends on the Member Profile of the purchasing Investor:

- Option 1: The TOB Option 1 transaction is used by Agency Investors to report that the beneficial rights in a registered loan have been transferred to them.
- Option 2: The TOB Option 2 transaction is used to report the transfer of the beneficial rights in a registered loan to a non-Agency Investor.

## Requirements: TOB Transactions

- Members are required to report the transfer of beneficial ownership interests in a MERS Loan or iRegistration loan from one Member Investor to another using the TOB transaction.
- Each Member that is a party to a TOB transaction is responsible for ensuring that the TOB Transfer Batch is initiated and confirmed within the timeframes set forth in this section.
- The new Agency Investor must create a TOB Option 1 Batch no later than seven (7) calendar days after the Transfer Date.
- The Servicer or Subservicer must create a TOB Option 2 Batch no later than seven (7) calendar days after the Transfer Date.
- When a Servicer receives the *Transfer of Beneficial Rights Reject (BF) Report* for one of its unregistered loans in a TOB Option 1 Batch, it must ensure that the loan is registered immediately.
- The old and new Investor must reconcile the TOB transaction:
  - o The old Investor (i.e., the seller) must verify that its TOB Transfer Batches for the previous month were accepted by the new Investor prior to the Transfer Expiration Date.
  - o The new Investor (i.e., the buyer) must verify the MIN Record transfers in the TOB Transfer Batches that name it as the new Investor, accept the correct MIN Record transfers, report any discrepancies to the old Investor, and reject any MIN Record transfers that should not be reported as transferred.
  - o The new Investor must verify that it has confirmed the TOB Transfer Batches naming it as the new Investor for the previous month prior to the Transfer Expiration Date.
  - o The old Investor, Servicer, and/or Subservicer must work with the new Investor to address any rejected MIN Record transfers, making the necessary corrections to allow the new Investor to accept the MIN Record transfers as applicable.

## TOB Option 1 Transfer

A TOB Option 1 Transfer is used by Agency Investors like Freddie Mac, Ginnie Mae, and Fannie Mae to report that the transfer of the beneficial ownership interests of a registered loan has been transferred to them. TOB Option 1 Batches:

- Cannot be canceled,
- Require no Confirmation, and

**MERS**

- Automatically remove any Org IDs from the Interim Funder or Warehouse/Gestation Lender fields on the MIN Record.

Important dates for a TOB Option 1 Batch include:

- Transfer Creation Date: The date on which a TOB Option 1 Batch was created.
- Transfer Date: The date on which the beneficial rights are reported as transferred to the new Investor on MERS® System, which may be the Transfer Creation Date or the current processing date if the Transfer Creation Date is in the past. The Transfer Date cannot be changed for a TOB Option 1 Batch.

## Procedure: TOB Option 1 Transfer

1. The TOB Option 1 Transfer process begins when a Member delivers a loan to an Agency Investor per the Agency's specific instructions.

2. The Agency Investor records the transfer of beneficial rights on its own system and then submits a TOB Option 1 transaction to MERS® System to report the transfer.

3. Any MIN Record transfers in the TOB Option 1 Batch that are registered on MERS® System are transferred to the Agency Investor on the Transfer Date.

4. Any MIN Record transfers in the TOB Option 1 Batch for loans that have not been registered by the Transfer Date continue to cycle for up to ten (10) days.

   o   If the registering Member registers the loans within the ten (10) day cycling window, MERS® System processes the TOB Option 1 Batch to the Agency Investor.

   o   If the registering Member registers the loan after the ten (10) day cycling window:

       ▪   The registering Member must name the Agency in the Investor field and contact the Agency for further instruction, or

       ▪   The Agency Investor, at its discretion, can submit another TOB Option 1 Batch for the MIN Record transfer once the loan is registered.

5. Registered loans that are rejected from the TOB Option 1 Batch due to a processing error should be reviewed and resubmitted by the new Investor as appropriate.

6. The current and new Investor reconcile the *TOB* transaction.

Note: Most TOB Option 1 Transfers are system-to-system transactions, but a TOB Option 1 Batch can be created on MERS® System (see Transfer of Beneficial Rights, Option 1 QRG).

## System Actions: TOB Option 1 Transfer

- A MIN Record transfer can co-exist in a TOB Option 1 Batch and a TOS Batch.
- A TOB Option 1 Batch replaces any Option 2 Investor named on a MIN Record. The Option 2 Investor is notified in the optional *Investor Removed by Option 1 TOB (BI) Report.*
- MIN Record transfers in concurrent Option 1 and Option 2 TOB Batches are deleted from the Option 2 Batch when the Option 1 Batch processes and reported on the optional *MINs Deleted from Transfer of Beneficial Rights (BH) Report.*

### On the Transfer Date:

- The Investor and Document Custodian fields are updated on each MIN Record per the TOB transaction.
- The new Investor may update the Agency ID for the MIN Record to identify the Member that sold them the loan.

**MERS**

- Any existing Interim Funder or Warehouse/Gestation Lender named on the MIN Record before the transfer is removed.
- Audit entries for the TOB Option 1 transaction are written to the *Milestones*, *MIN Audit*, and *MIN Transfer Audit* pages for the MIN Record.
- The mandatory *Physical Transfer of Beneficial Rights (BB) Report is generated, identifying each transferred MIN Record*.
- For any unregistered loans in a TOB Option 1 Batch, the Member that should have registered the loan receives the *Transfer of Beneficial Rights Reject (BF) Report* listing its unregistered loans if the Member's Agency ID is included in its Member Profile.
- Unregistered loans in a TOB Option 1 Batch that are in the ten (10) day cycling window are reported to Agency Investors in the mandatory *Transfer of Beneficial Rights Reject (BF) Report*.

## TOB Option 2 Transfer

A TOB Option 2 Transfer is initiated on MERS® System by a Servicer or Subservicer to report the transfer of the beneficial ownership interests of a registered loan to a non-Agency Investor. TOB Option 2 Batches:

- Cannot be used to report a transfer to an Agency Investor,
- Require Confirmation from the current and new Investor, and
- Do not remove Interim Funder or Warehouse/Gestation Lender Org IDs from a MIN Record.

Important dates for a TOB Option 2 Batch include:

- Transfer Creation Date: The date on which a TOB Option 2 Batch was created.
- Transfer Date: The date on which the beneficial rights are reported as transferred to the new Investor on MERS® System.
- Transfer Expiration Date: The date on which a TOB Option 2 Batch expires:
  - o MIN Record transfers not fully accepted or rejected by the Transfer Expiration Date remain with the current Primary Organizations and Associated Members.
  - o MERS® System sets the Transfer Expiration Date to be 31 calendar days after the Transfer Creation Date or the Transfer Date, whichever is later.

### *Procedure: TOB Option 2 Transfer*

1. The TOB Option 2 Transfer process begins when two Members enter into a Purchase and Sale Agreement to transfer the beneficial rights of one or more registered loans.

2. The current Servicer or Subservicer creates a TOB Option 2 Batch (see Transfer of Beneficial Rights, Option 2 QRG).
   - o All parties named in the TOB Option 2 Batch can view the unexpired Batch in MERS® System. The *MIN Summary* page identifies a MIN Record in a Batch.
   - o While the TOB Option 2 Batch is in a **Pending** or **Overdue** status, the initiating Member can:
     - Change the Transfer Date, which removes any previous Confirmations. All MIN Record transfers in the Batch must be confirmed again.
     - Add MINs to the Batch, but the additional MIN Record transfers must be confirmed before the transfers will be reflected on MERS® System.
     - Delete MINs from the Batch that were not yet confirmed by the new Investor.
     - Cancel the entire Batch before the Transfer Expiration Date.

**MERS**

- o Any Member that is a party to the TOB transaction may reject the Transfer Batch at any time before the Transfer Expiration Date, even if its Confirmation is automatic.

3. The current and new Investors confirm the TOB Batch prior to the Transfer Expiration Date (see Transfer Confirmation QRG).

- o If the current Servicer Org ID is also the current Investor, the current Investor's Confirmation is automatic.
- o If a current or new Investor is a Passive Investor, its Confirmation is automatic.
- o The new Investor can change its Confirmations any time prior to the Transfer Date.
- o Interim Funder or Warehouse/Gestation Lender Org IDs do not have to be removed from a MIN Record for a TOB Option 2 Batch to be processed (see Interim Funding Interests).

4. The current Investor, Servicer, or Subservicer works with the new Investor to address any MIN Record transfers rejected from the TOB Option 2 Batch.

5. The current and new Investor reconcile the TOB transaction.

## System Actions: TOB Option 2 Transfer

### Before the Transfer Date (Pending Status):

- A MIN Record transfer can exist in both a TOB Option 2 Batch and a TOS Batch only if the new Servicer and new Investor are the same entity.
- The optional *Pending Transfer of Beneficial Rights (BA) Report* is generated daily listing all TOB Option 2 Batches with a future Transfer Date. Confirmations are reported on the *BA Report* up to the Transfer Date.
- If a MIN Record transfer is rejected, it is reported on the mandatory *Transfer of Beneficial Rights Rejects (BF) Report* for that processing day.
- If a MIN Record transfer is added to or deleted from a TOB Option 2 Batch, including one deactivated while in the Batch, it is reported on the mandatory *Modified Batch –Transfer of Beneficial Rights (BL) Report.*
- A TOB Option 2 Batch is automatically canceled if all of the MIN Record transfers are deleted from the Batch.
- If a TOB Option 2 Batch is canceled, it is reported on the optional *Canceled Transfer of Beneficial Rights (BG)* report.
- MIN Record transfers in concurrent TOB Option 1 and TOB Option 2 Transfer Batches are deleted from the pending Option 2 Batch when the Option 1 Batch processes. The deleted MIN Record transfers are reported on the optional *MINs Deleted from Transfer of Beneficial Rights (BH) Report*.

### On the Transfer Date:

- For each fully-confirmed MIN Record transfer in the TOB Option 2 Batch:
  - o The Investor and Document Custodian fields on the MIN Record are updated per the TOB transaction.
  - o Audit entries for the TOB Option 2 transaction are written to the *Milestones, MIN Audit,* and *MIN Transfer Audit* pages for the MIN Record.
  - o The transfer is reported on the mandatory *Physical Transfer of Beneficial Rights (BB) Report* and the optional *MIN Milestones (VA) Report.*
  - o The accepted MIN Record transfer is removed from the TOB Option 2 Batch.
- For each rejected MIN Record transfer in the TOB Option 2 Batch: